IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| **HALEY HARGIS, as Personal Representative of the ESTATE OF JONATHAN MARK HARGIS,** ) ) ) ) | |
| **Plaintiff,** ) ) | **Docket No.: 2:22-cv-00011** |
| v. ) ) | **JUDGE CRENSHAW/ MAGISTRATE JUDGE NEWBERN** |
| **OVERTON COUNTY, TENNESSEE, CITY OF LIVINGSTON, MELISSA BARNES, AMANDA POORE, DONALD SHAVER, DUSTIN PETTIT, AMBER BEATY, DAVID NELSON, SAMUEL WEBB, CHRISTENA SAKKINEN, MELODY CRAWFORD, BRITTANY SIDWELL, MICHAEL THARP, J.D. MASTERS, THOMAS JOHNSON, and JEREMY LAYCOCK,** ) ) ) ) ) ) ) ) ) ) ) ) | |
| **Defendants.** ) | |

## COUNTY DEFENDANTS' RESPONSE TO PLAINTIFF'S RULE 37(e) MOTION FOR SPOLIATION SANCTIONS

County Defendants hereby respond to Plaintiff's Rule 37(e) Motion for Spoliation Sanctions. (D.E. 62).

**I. RELEVANT FACTS**

On March 30, 2021, Jonathan Mark Hargis became unresponsive after an incident at the Overton County Jail ("the Jail") where he was being held while awaiting transport to a mental health facility. (D.E. 1). Due to the possibility of an in-custody death, the Tennessee Bureau of Investigation ("TBI") was called in the same day to investigate. (D.E. 62-4, Deposition of Tim Poore, pg. 77: 10-78:3). The Jail does not have a policy for conducting internal investigations under these circumstances, or where

there is an in-custody death, due to the standard procedure of the TBI conducting such investigations. (*Id.*; Declaration of Tim Poore, ¶ 8).

Chief Deputy Poore reviewed the jail's video footage to assist the TBI agents with their investigation. (*Id.*, ¶ 3). They started by reviewing the footage from the camera titled "Booking." *(Id.)* Chief Deputy Poore started the video at 12:53 p.m., which is around the time that Officer Christina Sakkinen noticed Mr. Hargis was clawing out his eyes and she called for backup. *(Id.)* At around 1:07 p.m., the TBI agents asked if there was a better angle because they could not see what was happening behind the propped open cell door. *(Id.)* Chief Deputy Poore pulled up the footage from the camera angle titled "Booking Phone" and started at 12:56 p.m. *(Id.)* After watching the entire incident, the TBI agents were satisfied with the angle from the "Booking Phone" camera. *(Id.)* The TBI agents then asked Chief Deputy Poore to pull footage from when Mr. Hargis was brought into the jail up until the start of the incident. *(Id.)* This video footage was saved and copied per the directive of the TBI. *(Id.)* The TBI never came back and asked for additional footage. *(Id.)*

At the same time, Jail Administrator Amanda Poore was assisting with the investigation by arranging to have all the corrections officers interviewed by the TBI and collecting their incident reports. (Declaration of Amanda Poore, ¶ 3). After the interviews, the officers met in a small courtroom adjoining the jail where information was provided to the officers on how they could seek mental help if they needed to talk about the incident. (*Id.*, ¶ 3). JA Poore went home after the meeting. *(Id.)* JA Poore forgot to prepare an incident report due to everything going on after the incident. (*Id.*, ¶ 4). She remembered to prepare her report when she got to work on the morning of April 5, 2021. *(Id.)* She also prepared a report regarding her interactions with Mr. Hargis on

March 29, 2021, after two (2) corrections officers were injured while putting Mr. Hargis into a holding cell in the booking area. *(Id.)*[1]

Ms. Hargis traveled from Hamilton, Ohio on April 5, 2021, to meet with JA Poore and Sheriff Garrett. (D.E. 62-8, ¶¶ 6-7). JA Poore and Sheriff Garrett described what happened during the incident with Mr. Hargis. (A. Poore Decl., ¶ 5). JA Poore also described her interactions with Mr. Hargis on March 29, 2021, including that two (2) corrections officers had been injured and she gave Mr. Hargis a Mountain Dew to help calm him down. *(Id.)* Ms. Hargis thanked JA Poore and apologized that the two (2) officers had been injured. *(Id.)* In discussing Mr. Hargis's death, JA Poore mentioned she believed he had died of a heart attack which is the only cause of death of which anyone was aware at that time. (D.E. 62-8, ¶ 10; A. Poore Decl., ¶ 8). Ms. Hargis said she had not had a relationship with Mr. Hargis in three (3) years. (*Id.*, ¶ 6). She said the family knew he had mental issues and there had been similar instances in the past. *(Id.)* The family hugged and thanked JA Poore after the meeting. *(Id.)* No one with the County heard from Ms. Hargis after that meeting. (T. Poore Decl., ¶ 9).

The next time the County heard from anyone regarding the incident with Mr. Hargis was when Lillieann Sells, the Overton County Attorney, received a letter from Alan Rawls on September 2, 2021, asking the County to preserve all evidence related to the incident. (*Id.*, ¶ 9 and **Exhibit A**). The jail's security cameras automatically record over previous footage every 25 to 30 days unless the footage is preserved. (*Id.*, ¶ 4). Chief Deputy Poore checked the video footage from the date of the incident when the letter was received. (*Id.*, ¶ 9). The footage that had not been saved pursuant to the TBI's

---

[1] Plaintiff claims this incident report was "unnecessary." (D.E. 63, pg. 15, fn 71). The report was prepared to document JA Poore's interactions with Mr. Hargis and pursuant to Overton County Detention Facility Policy 1.4, which requires that an incident report be prepared for injury of a staff member. (A. Poore Decl., ¶ 10 and **Exhibit A**).

request had been automatically recorded over, likely sometime in late April or early May 2021. (*Id.*, ¶ 8).

## II. STANDARD

### A. Standard

The Sixth Circuit set forth the standard for determining whether a particular spoliation sanction is appropriate:

> A party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; *and* (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. Thus, an adverse inference for evidence spoliation is appropriate if the Defendants knew the evidence was relevant to some issue at trial and their culpable conduct resulted in its loss or destruction. This depends on the alleged spoliator's mental state regarding any obligation to preserve evidence and the subsequent destruction.

*Adkins v. Wolever*, 692 F.3d 499, 503-504 (6th Cir. 2012) (emphasis in original) (quoting *Beaven v. United States Dep't of Justice*, 622 F.3d 540, 553) (6th Cir. 2010)). "The more severe sanctions available under Rule 37(e)(2), including an adverse inference jury instruction, may be imposed only on a finding of specific intent 'to deprive another party of the information's use in the litigation.'" *EPAC Technologies, Inc. v. HarperCollins Christian Publishing, Inc.*, No. 3:12-cv-00463, 2019 U.S. Dist. LEXIS 1816, at *49-50 (M.D. Tenn. Jan. 4, 2019).

The Court has outlined the purpose of a spoliation sanction as follows:

> When appropriate, a proper spoliation sanction should serve both fairness and punitive functions, but its severity should correspond to the district court's finding after a fact-intensive inquiry into a party's degree of fault under the circumstances, including the recognition that a party's degree of fault may range from innocence through the degrees of negligence to intentionality. Thus, a district court could impose many different kinds of sanctions for spoliated evidence, including dismissing a case, granting

summary judgment, or instructing a jury that it may infer a fact based on
lost or destroyed evidence.

*Adkins,* 503-504. The sanctions imposed "must be the least drastic available to adequately mitigate the prejudice." *Stedeford v. Wal-Mart Stores, Inc.*, No. 2:14-cv-01429-JAD-PAL, 2016 U.S. Dist. LEXIS 83091, at *20 (D. Nev. June 24, 2016); s*ee also Estate of Romain v. City of Grosse Pointe Farms*, No. 2:14-12289, 2016 U.S. Dist. LEXIS 181170, at *17 (E.D. Mich. Nove. 22, 2016); *Nacco Materials Handling Group Inc., v. Lilly Co.*, 278 F.R.D. 395, 405 (W.D. Tenn. 2011).

### B. The County Defendants were unaware of an obligation to preserve the video before it was recorded over automatically.

Plaintiff claims the County Defendants were put on sufficient notice of reasonably foreseeable litigation as soon as Mr. Hargis became unresponsive on the floor of the jail. (D.E. 63, pg. 14). The record, however, does not support Plaintiff's position.

#### 1. The County and Amanda Poore were not put on notice of impending litigation by Plaintiff before the video was recorded over automatically.

The Sixth Circuit has held that a party's duty to preserve evidence must be triggered by an event that places the party on "notice that the evidence is relevant to the litigation or . . . should have known that the evidence may be relevant to future litigation." *John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir. 2008). Plaintiff heavily relies on a Minnesota District Court case to support her position that the County was put on notice that it had a duty to preserve footage from both cameras following Mr. Hargis's death. *See Vogt v. MEnD Corr. Care, PLLC*, 2023 WL 2414531 (D. Minn. March 8, 2023). The *Vogt* case does not provide binding precedent on this Court, nor is it instructive as the facts are entirely distinguishable from those in this matter.

In finding that the county had sufficient notice of reasonably foreseeable litigation, the *Vogt* court pointed to the fact that, <u>on the very day of the decedent's death</u>, his family had met with the county, expressed an interest in watching the video footage, and commented that they wanted to speak with an attorney about what happened. *Id.*, at *8. None of these facts are present in this case. Plaintiff learned her father was brain dead on April 1, 2021, and traveled to the hospital to authorize the release of his body on April 2, 2021. (D.E. 62-8, Declaration of Hayley Hargis, ¶¶ 2-3). She took photographs of Mr. Hargis while he was in the hospital because "his body looked horrible." (Deposition of Haley Hargis, pg. 92:7-23). Despite learning that there was a pending investigation by the TBI and speaking with JA Poore that day, Plaintiff traveled back to Ohio and waited until the following Monday to meet with JA Poore and Sheriff Garrett at the jail. (*Id.*, ¶¶ 5-7).[2] They told Plaintiff, her mom, and brother's girlfriend what happened, and that the incident was being investigated by the TBI. (*Id.*, ¶¶ 8-10). No one asked if there was any video footage to review and nobody mentioned speaking with an attorney. (A. Poore Decl., ¶ 7). At no time did Ms. Hargis, or anyone accompanying her that day, indicate that litigation would follow. *Id.* In fact, Plaintiff indicated she had not had a relationship with Mr. Hargis in some time and expressed gratitude by thanking and hugging JA Poore at the conclusion of the meeting. (*Id.*, ¶ 6). Plaintiff's lack of urgency in meeting with County officials and her subsequent actions at the meeting gave the impression she would not be filing a lawsuit related to her father's death.

---

[2] The distance from Hamilton, Ohio to Livingston, Tennessee where the Overton County Sheriff's Department is located is approximately 4 ½ hours.

The County did not hear from Ms. Hargis after the meeting on April 5, 2021. (T. Poore Decl., ¶ 9). She never followed up to request a copy of video footage or further information from the County after the TBI agent she had been communicating with stopped responding to her requests. It was not until five months later that the County was first put on notice of potential litigation. Plaintiff's counsel sent a letter to Lillieann Sells, the County Attorney, on September 2, 2021, specifically asking the County to preserve evidence. (*Id.,* and **Exhibit A**). By that time, however, the video footage had already been recorded over automatically. *(Id.)* Due to Plaintiff's actions, or lack thereof, in the days and months following her father's death, it was reasonable for the County to believe Plaintiff was <u>not</u> going to file a lawsuit. Thus, a duty did not arise on the County's part to preserve all of the video evidence until September 2, 2021.

Plaintiff claims the County should have known it had a duty to preserve all of the video footage for possible future litigation because it took steps to preserve footage from one of the camera angles. (D.E. 63, pg. 15-16). Plaintiff cites *Culhane v. Walmart Supercenter*, 364 F. Supp. 3d 768 (E.D. Mich. 2019) to support her position, however, that case is also factually distinguishable from this matter. In *Culhane*, the plaintiff's attorney sent a letter to Wal-Mart's insurance carrier within 30 days of the incident informing the company that the plaintiff had retained counsel and <u>requesting a copy of the video of the incident</u>. *Id.*, 771. Wal-Mart's asset protection manager testified that video footage is generally saved 30 days and then rerecorded over. *Id.* He took steps to preserve the interior footage of the incident but not the exterior footage and testified he <u>could not remember</u> why he did not preserve all of the footage. *Id.* Wal-Mart also had a policy regarding what information should be gathered and retained when an accident occurs. *Id.*, 773.

To the contrary, the County did not receive notice of pending litigation, especially in light of Plaintiff's actions in the days and weeks following the incident. The jail does not have a policy regarding the use and storage of camera footage within the jail. (T. Poore Decl., ¶ 6). Chief Deputy Poore saved the videos according to what was requested by the TBI agents and did not himself pick and choose which videos to save. The TBI investigation focuses on uncovering any criminal activity that may be associated with the an in-custody death. Therefore, Chief Deputy Poore had every reason to believe that his cooperation with the directive of the TBI preserved any necessary evidence to accomplish that end. Under these circumstances, Chief Deputy Poore's actions were reasonable in specifically saving the footage from one of the camera angles and believing that that was sufficient to provide the TBI with everything the agents needed to determine any wrongful conduct and/or criminality. As such, there was no further duty to preserve all of the video footage.

By the time the County was put on notice that the evidence may be relevant to future litigation, the video footage had been recorded over automatically. As such, Plaintiff is not entitled to a mandatory adverse inference instruction against the County.

### 2. The individual County Defendants did not have control over preservation of the video.

Plaintiff does not allege that the individual County Defendants had a duty to preserve the video yet seeks a sanction that grossly prejudices these defendants. Plaintiff alleges that a mandatory adverse inference instruction is appropriate against all County Defendants, citing to *Vogt* to support her position that the County's actions in failing to

preserve the video should be imputed to the individual officers. (Plaintiff's Brief, pg. 24).³

In *Adkins v. Wolever*, 692 F.3d 499 (6th Cir. 2012), the Sixth Circuit upheld a district court's decision not to impose a spoliation sanction on a state prison employee when the state failed to preserve evidence. *Id.* The Court held:

> The district court reviewed the evidence and concluded that Wolever was not culpable because he had no control over the evidence. This conclusion was not clearly erroneous. The evidentiary hearing produced testimony that evidence used in internal investigations would be preserved and that Wolever could rely on IMAX to maintain the evidence per its policy. Other testimony showed that Wolever could only access the evidence through the litigation coordinator and that the surveillance video might already have been lost when Wolever was served with Adkins's complaint in January 2004. Even if we were to disagree with the district court's ultimate conclusion on culpability, it does not necessarily follow that the district court's determination should be upset. Although the district court's decision runs counter to the holdings of some other courts, the evidence in the record provides a basis for the district court's conclusion that Wolever was not culpable. [A] fact-intensive inquiry into [Wolever's] degree of fault under the circumstances could reasonably generate the conclusion that Wolever was innocent of any destruction or loss.

*Id.*, 506 (internal citations and quotations excluded). The Court further held that courts should "consider spoliation questions on a case-by-case, considering the purposes of a spoliation sanction and the factors for determining whether one should be imposed . . ." instead of imposing a "bright-line rule" that an employee should be held personally responsible for his or her employer's failure to preserve evidence. *Id.*

As in *Adkins*, the corrections officers do not have access to the video footage from the jail's security cameras. (T. Poore Decl., ¶ 5). When Chief Deputy Poore met with the TBI agents and pulled the requested footage, it was automatically downloaded and saved to a folder on his desktop computer. (*Id.*, ¶ 4). The corrections officers do not have

---

³ In *Vogt*, the Minnesota District Court cites to several cases from other districts, none of which are binding precedent requiring this Court to impose a spoliation sanction in this instance. See *Adkins v. Wolever*, 692 F.3d 499, 505 (6th Cir. 2012).

access to Chief Deputy Poore's desktop computer. (*Id.*, ¶ 5). They were not involved in determining what portions of the videos were downloaded and saved from the incident with Mr. Hargis. *(Id.)* JA Poore was also not present while the TBI agents were viewing the video and was not involved in determining what video to preserve. (A. Poore Decl., ¶ 3). She believed the TBI had requested all the footage that was needed for the investigation. *(Id.)* Further, as set forth above, JA Poore had no reason to believe there was a duty to preserve any additional video footage based on Plaintiff's actions when she came to the jail on April 5, 2021.

The officers did not have sufficient control over the video footage to be able to preserve it for potential future litigation. Additionally, the corrections officers had no reason to know what footage was preserved by the TBI and that the footage at issue was not saved. Thus, a mandatory adverse inference instruction is not appropriate against the individual County Defendants and is a grossly harsh sanction based upon the circumstances.

### C. The County Defendants are the only party prejudiced.

Plaintiff claims she is prejudiced by the County's failure to save the angle from the camera labeled "Booking." (D.E. 63, pp. 16-19). Based on Plaintiff's arguments alone, the County Defendants are the only party to be prejudiced from not being able to show the "Booking" camera angle to the jury. The testimony given in this case is that Officer Dustin Pettit got his fingers caught in the handcuffs which caused his body to be pulled on top of Mr. Hargis during the incident. (*See* D.E. 70, pp. 4-6). While this can be seen from the "Booking Phone" camera, a different angle would have provided further support for this testimony. The medical examiner, who Plaintiff has retained as her expert in this matter, concluded that the manner of Mr. Hargis's death was homicide

based on her review of the video footage available. (Deposition of Dr. Emily Dennison, pp. 62:8-63:23). The County Defendants are left to rely on the testimony of the officers that no one was putting pressure on Mr. Hargis to contradict this opinion. (*See* D.E. 70, ppg. 14-18). According to Officer Amber Beaty, the view from the "Booking" camera would have supported their testimony.

Plaintiff is not prejudiced by the absence of the "Booking" camera footage due to the fact that the other camera angle exists. The video footage from the "Booking Phone" camera shows the entire incident. This angle was clearly sufficient for the TBI to conduct and conclude its investigation. Plaintiff was able to extensively question each officer involved in the incident and even walked through the video step by step with some of the County Defendants. The "Booking Phone" footage will allow the jury to view the incident and come to its own conclusions about the credibility of the officers' testimony. Plaintiff claims the deleted video footage would more likely have "undermined" the County Defendants' testimony of events, however, there is nothing in the record to support this position and is sheer speculation. The only actual evidence given is that the footage would support the officers' version of events, thus prejudicing the County by the lack of its existence.

> **D. There is no evidence the County Defendants had an intent to deprive Plaintiff of the video's use in the litigation.**
>
> **1. The County has a credible explanation for why the video was not preserved.**

Plaintiff claims the County does not have a credible explanation for why the video was not preserved. The County Defendants disagree, and the record does not support such an allegation. Plaintiff again attempts to compare the facts in this matter to those in *Vogt*. In *Vogt*, the only explanation given for not saving the relevant camera footage

was that "I think the two angles that they had were the ones that they – they thought they needed to record, that depicted that area where [Vogt] was." *Vogt*, at *18. *See also Culhane*, 364 F. Supp 3d at 774 (where the risk manager <u>could not remember</u> why he did not preserve all of the footage). The facts in this matter are also distinct from those in *Estate of Hill ex rel. Grube v. NashCare, Inc.*, No. 2:20-cv-00410-MKD, 2022 U.S. Dist. LEXIS 83714, at *12 (E.D. Wash. May 9, 2022), another case cited by Plaintiff. In *Estate of Hill*, the individual assigned to testify on behalf of the jail could not say why some portions of the video had been preserved and others were not. He could not identify the person who would be responsible for preserving the video footage. In this case, Chief Deputy Poore saved the "Booking Phone" footage because the TBI agents specifically requested a different camera angle <u>when they could not see the incident from the "Booking" camera footage due to the cell door being open</u>. Such an explanation is credible in light of the fact that the TBI agents made such a request in order to conduct their investigation into the incident.[4]

Chief Deputy Poore's testimony that he "probably should have" preserved the video further supports that the County did not have a culpable state of mind. "In instances such as these, '[a] showing of negligence or even gross negligence will not do the trick.'" *Black v. Costco Wholesale Corp.*, 542 F. Supp. 3d 750 (M.D. Tenn. 2021), (quoting *Appelbaum v. Target Corp.*, 831 F.3d 740, 745 (6th Cir.). The County has a credible explanation for why it did not save the footage from the "Booking" camera angle and its failure to save such footage was negligent at best. As stated above, there

---

[4] In *Vogt*, *Culhane*, and *Estate of Hill*, there was no question that the defendants were on notice that there would be pending litigation. In this case, as set forth above, the County was not put on reasonable notice that Plaintiff would be filing a lawsuit related to the death of her father due to Plaintiff's on actions. Further, none of these cases provide binding precedent on this Court.

was no indication that litigation would follow, and there was every reason to believe that all useful footage had been preserved. Certainly there is no evidence that the County Defendants had any intent to deprive Ms. Hargis the use of security footage for litigation. The arguments by Plaintiff are insufficient to meet the "intent to deprive" standard.

> **2. The County Defendants did not mislead medical staff or Plaintiff about the circumstances surrounding Mr. Hargis's death.**

In asking the Court to infer an intent to deprive, Plaintiff claims the County Defendants misled medical staff and Plaintiff's family regarding the circumstances surrounding Plaintiff's death. According to the paramedics who arrived on the scene, they responded to a call at the Overton County Jail that a patient was unresponsive. (Declaration of Glynn Mullinix; Declaration of Caleb Sells). When the paramedics arrived, they were met by the corrections officers who stated the patient had not been breathing for several minutes. (Mullinix Decl., ¶ 3 and **Exhibit A**). Mr. Hargis was on his back on the floor and was wearing leg shackles and handcuffs. *(Id.)* He had bruising on his wrists from the restraints. *(Id.)* The officers told the paramedics that Mr. Hargis had been trying to harm himself and had stopped breathing during their attempts to restrain him. *(Id.)* They said he had been in the prone position before he was turned over on his back. *(Id.)* The paramedics were only at the jail a matter of minutes before loading Mr. Hargis in the ambulance to be taken to Livingston Regional Hospital. (*Id.*, **Exhibit A**; Sells Decl., ¶ 4). Their interactions with the officers were brief. *(Id.)* While an officer rode in the ambulance with Mr. Mullinix, he does not recall any conversations with him due to their performing lifesaving efforts on Mr. Hargis in the short drive to the hospital. (Mullinix Decl., ¶ 4). The paramedics conveyed what they knew about the

incident and their attempts to resuscitate Mr. Hargis to hospital staff.  (*Id.*, ¶ 5). The officers did not recall speaking to hospital staff when they arrived except to ask where Mr. Hargis had been taken. (Deposition of David Nelson, pp. 51:21-52:19; Deposition of Samuel Webb, pp. 121:19-127:1).

After Mr. Hargis's death, the only cause of death of which the officers were aware was that he had died of a heart attack. (A. Poore Decl., ¶ 8). Plaintiff points to an entry in the nurse's progress notes from April 4, 2021, that JA Poore told Nurse Grimsley that the family had come by and stated the autopsy showed Mr. Hargis suffered a heart attack. (D.E. 63, pp. 7-8). JA Poore is unaware of where this information came from, as neither she nor Nurse Grimsley would have worked on April 4, 2021, which was a Sunday. (A. Poore Decl., ¶ 9). JA Poore did not meet with the family until the following day and there was no discussion of an autopsy during the meeting. *(Id.)* If JA Poore at one point told Nurse Grimsley that Mr. Hargis died of a heart attack, it was based on information that she had been hearing at that time as to his cause of death. *(Id.)*

There is no evidence in the record to support Plaintiff's position that the County Defendants "influenced" or "misled" the medical staff or Plaintiff about Mr. Hargis's cause of death.

### E. A mandatory adverse inference instruction against the County Defendants is not appropriate.

In *Black*, this Court found that the evidence did not support the "requisite culpable state of mind required for severe sanctions, such as . . . adverse jury instructions." *Black v. Costco Wholesale Corp.*, 542 F. Supp. 3d 750 (M.D. Tenn. 2021), 774. In that case, the defendant had saved a small portion of surveillance footage in the area of the alleged incident, and though he could have accessed and saved additional

video, he chose not to do so, and the additional footage was erased. The Court concluded that this "evidence is insufficient for a finding of culpability and severe sanctions here. Rule 37 explicitly rejects the authorization of adverse inference jury instructions in cases where either no specific intent is found, or a party can prove no more than negligence or gross negligence." *Id.*, 755 (internal quotations omitted).

As this Court found in *Black,* and the Sixth Circuit concluded in *Adkins*, there is no evidence for a finding that such a severe sanction as a mandatory adverse inference instruction should be given against the County Defendants. Plaintiff fails to cite to any binding or instructive precedent in her brief that would support this Court issuing such an instruction. Not only is such an instruction not appropriate under these circumstances, but an imputation of such a sanction to the individual Defendants, who had no participation in the alleged spoliation, would be highly prejudicial in light of the fact that they had no control over the videos or what footage was preserved and no knowledge that all footage had not been preserved. Plaintiff provides no legal or factual support in her motion that the circumstances in this matter warrant such a sanction against the County, much less the individual County Defendants.

## III. CONCLUSION

The evidence shows that Plaintiff knew about her father's death and that the TBI's investigation into the incident was pending when she met with the County officials on April 5, 2021. Despite this, she did not mention speaking with an attorney or filing a claim against the County regarding her father's death, and she did not ask if there was any video footage of the incident. The video footage that was preserved by the County shows the entire incident and was selected at the request of the TBI agents conducting

the investigation into any criminality surrounding the events. There is no evidence that sanctions are warranted under Rule 37 of the Federal Rules of Civil Procedure.

The only sanction Plaintiff claims is appropriate is that a mandatory adverse inference instruction be given against the County Defendants. The record is devoid of any evidence that the County Defendants had the requisite intent to deprive Plaintiff of the evidence at issue. As such, Plaintiff's motion and request for spoliation sanctions should be denied.

Respectfully submitted,

*/s/ Robyn Beale Williams*
Robyn Beale Williams, BPR #19736
Laura Adams Hight, BPR #031942
**FARRAR | BATES | BEREXA**
12 Cadillac Drive, Suite 480
Brentwood, Tennessee 37207
Phone: 615-254-3060
Fax: 615-254-9835
rwilliams@fbb.law
lhight@fbb.law
*Counsel for Defendants Overton County, Melissa Barnes, Amanda Poore, Donald Shaver, Dustin Pettit, Amber Beaty, David Nelson, Samuel Webb, Christena Sakkinen, Melody Crawford, Brittany Sidwell, and Michael Tharp*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this the 13th day of September, 2023, a true and correct copy of the foregoing has been forwarded via the Court's electronic filing system to:

| | |
|---|---|
| Gregory Brown, BPR #027944<br>G. Alan Rawls, BPR # 038300<br>Lowe Yeager Brown PLLC<br>900 S. Gay Street, Suite 2102<br>Knoxville, TN 37902<br>Phone: 865-521-6527<br>Fax: 865-637-0540<br>gb@lyblaw.net<br>gar@lyblaw.net<br>*Counsel for Plaintiff* | Daniel H. Rader, IV, BPR # 025998<br>Daniel Hurley Rader, III, BPR # 002835<br>Randall A. York, BPR # 010166<br>Moore, Rader, Fitzpatrick and York, P.C.<br>46 N. Jefferson Ave.<br>P O Box 3347<br>Cookeville, TN 38501<br>(931) 526-3311<br>Fax: (931) 526-3092<br>danny@moorerader.com<br>danrader@moorerader.com<br>randyyork@moorerader.com<br>*Counsel for City of Livingston, J.D. Masters, Thomas Johnson and Jeremy Laycock* |

*/s/ Robyn Beale Williams*
Robyn Beale Williams