# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| HALEY HARGIS, as Personal Representative of the ESTATE OF JONATHAN MARK HARGIS, | ) ) ) ) | |
| Plaintiff, | ) ) | NO. 2:22-cv-00011 |
| v. | ) ) | |
| OVERTON COUNTY, TENNESSEE, CITY OF LIVINGSTON, MELISSA BARNES, AMANDA POORE, DONALD SHAVER, DUSTIN PETTIT, AMBER BEATY, DAVID NELSON, SAMUEL WEBB, CHRISTENA SAKKINEN, MELODY CRAWFORD, BRITTANY SIDWELL, MICHAEL THARP, J.D. MASTERS, THOMAS JOHNSON, and JEREMY LAYCOK, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Pending before the Court are two motions for summary judgment, filed by the City of

Livingston and Police Officers J.D. Masters ("Masters"), Thomas Johnson ("Johnson"), and

Jeremy Laycock ("Laycock") (collectively, the "City Defendants") and Overton County, Jail

Administrator Amanda Poore ("Poore"), Lieutenant Donald Shaver ("Shaver"), Patrol Lieutenant

Michael Tharp ("Tharp"), and Corrections Officers Melissa Barnes ("Barnes"), Dustin Pettit

("Pettit"), Amber Beaty ("Beaty"), David Nelson ("Nelson"), Samuel Webb ("Webb"), Christena

Sakkinen ("Sakkinen"), Melody Crawford ("Crawford"), and Brittany Sidwell ("Sidwell")

(collectively, the "County Defendants").

1

The City Defendants filed a Motion for Summary Judgment and/or Motion to Dismiss (Doc. No. 63), Memorandum of Law (Doc. No. 65), and Statement of Undisputed Facts (Doc. No. 66) on August 23, 2023. Plaintiff Haley Hargis ("Ms. Hargis"), personal representative of the estate of Jonathan Mark Hargis ("Mr. Hargis"), filed a Memorandum of Law in Response to City Defendants' Motion for Summary Judgment (Doc. No. 87) and Response to City Defendants' Statement of Undisputed Facts (Doc. No. 88) on September 20, 2023. On October 4, 2023, the City Defendants filed their Reply in Support of Motion for Summary Judgment (Doc. No. 95) and Responses to Plaintiff's Additional Statements of Fact (Doc. No. 96).

The County Defendants filed a Motion for Summary Judgment (Doc. No. 69), Memorandum of Law (Doc. No. 70), and Statement of Undisputed Facts (Doc. No. 71) on August 23, 2023. Ms. Hargis filed a Memorandum of Law in Response to County Defendants' Motion for Summary Judgment (Doc. No. 85) and Objections and Responses to County Defendants' Statement of Undisputed Facts (Doc. No. 86) on September 20, 2023. On October 4, 2023, the County Defendants filed their Reply in Support of Motion for Summary Judgment (Doc. No. 98) and Responses to Plaintiff's Additional Statements of Fact (Doc. No. 99).

All motions are fully briefed. For the reasons that follow, The Court has considered the City Defendants' and County Defendants' Motions for Summary Judgment and, for the reasons that follow, will grant in part and deny in part the motions as to Section 1983 claims against the individual Defendants, deny the motions as to Section 1983 municipal liability claims against the City of Livingston and Overton County, grant the motions as to the Tennessee false imprisonment claim, and grant in part and deny in part the motions as to the Tennessee assault and battery claims.

2

**MATERIAL FACTS**

Ms. Hargis brings this action as representative of her brother Jonathan Mark Hargis's estate. This case concerns the involuntary detention of Mr. Hargis in the Overton County Jail due to his mental state and his death in custody. The facts that follow derive from the record evidence before the Court, including the undisputed facts in the Parties' briefs, statements of undisputed material fact, declarations, and exhibits. Disputed facts are viewed in the light most favorable to the Plaintiff. See Tolan v. Cotton, 572 U.S. 650, 651 (2014).

**I.    Tennessee's Involuntary Commitment Law**

Central to this case is Tennessee's involuntary commitment law, Tenn. Code Ann. § 33-6-401 *et. seq*., that creates the process to detain a person for involuntary commitment to mental health treatment. Tennessee law dictates how the process starts:

> IF AND ONLY IF
>
> (1) a person has a mental illness or serious emotional disturbance, AND
> (2) the person poses an immediate substantial likelihood of serious harm . . . because of the mental illness or serious emotional disturbance,
>
> THEN
>
> (3) the person may be detained under § 33-6-402 to obtain examination for certification of need for care and treatment.

Tenn. Code Ann. § 33-6-401.

If an officer detains a person who appears to have mental or emotional issues and is at risk of harming himself or others, the person must then be "immediately examin[ed] . . . for certification of need for care and treatment." Tenn. Code Ann. § 33-6-402. Upon examination, the examiner completes a 6-401 Form "for EMERGENCY DETENTION for immediate examination for emergency admission." (Doc. No. 67-1 (Masters Dep.) at 54 (Ex. 7)).

Tennessee law requires that upon examination:

3

IF AND ONLY IF

(1) a person has a mental illness or serious emotional disturbance, AND

(2) the person poses an immediate substantial likelihood of serious harm . . . because of the mental illness or serious emotional disturbance, AND

(3) the person needs care, training, or treatment because of the mental illness or serious emotional disturbance, AND

(4) all available less drastic alternatives to placement in a hospital or treatment resource are unsuitable to meet the needs of the person,

THEN

(5) the person may be admitted and detained by a hospital or treatment resource for emergency diagnosis, evaluation, and treatment . . .

Tenn. Code Ann. § 33-6-403.

When the person is detained and brought to a medical professional for examination, "the physician, psychologist, or designated professional shall immediately examine the person and decide whether the person is subject to admission to a hospital or treatment resource." § 33-6-404. If the medical professional finds that the person is not subject to admission, the person "shall [be] release[d]." Id. If the medical professional find that the person is subject to admission, then that professional "shall complete a certificate of need for the emergency diagnosis, evaluation, and treatment . . ." Id. After completing the Certificate of Need (also referred to as a 6-404 Form), the medical professional "shall give the sheriff or the transportation agent . . . the original of the certificate [of need] and turn the person over to the custody of the sheriff or transportation agent who shall transport the person to a hospital or treatment resource that has available suitable accommodations." Tenn. Code Ann. § 33-6-406.

In Tennessee, prior to being involuntarily committed, medical professionals must complete both a 6-401 Form for examination and a Certificate of Need (6-404 Form) for commitment. Once the individual is committed to a hospital or treatment resource, that facility must independently

4

examine the person and complete a second Certificate of Need (6-404 Form). Tenn. Code Ann. § 33-6-407. An involuntarily committed person is entitled to a probable cause determination by a general sessions court within 24 hours of commitment, Tenn. Code Ann. §§ 33-6-413, -414, and a probable cause hearing within five days of commitment, Tenn. Code Ann. §§ 33-6-413, -422.

## II.   MONDAY, MARCH 29, 2021

### a.   <u>Officer Masters' Initial Interactions with Mr. Hargis</u>

At 6:53 and 6:59 on the morning of Monday, March 29, 2021, the city of Livingston, Tennessee received two 911 calls. (Doc. No. 88 ¶¶ 1-2). The calls reported that a man wearing a "red like jersey shirt" had entered a gas station and swore at the clerk because he didn't have any money. (<u>Id.</u> ¶ 1). The man then left the gas station and kicked a dumpster in the parking lot. (<u>Id.</u>). He then walked down a busy road into someone's yard, where he started swearing at the dog. (<u>Id.</u> ¶¶ 1-2). The man was Jonathan Mark Hargis. Livingston Police Officer J.D. Masters was dispatched to the gas station to investigate. (<u>Id.</u> ¶ 3). Officer Thomas Johnson drove separately to the scene as Masters' backup. (Doc. No. 64-3 ¶ 2). Masters observed Mr. Hargis walking from the gas station parking lot, down a street typically busy on weekday mornings, to the parking lot of the district attorney's office. (Doc. No. 88 ¶¶ 4-5).

Masters spoke to Mr. Hargis, who responded in an alternating excited, loud voice that would "later become calm again." (<u>Id.</u> ¶ 8). Masters asked Mr. Hargis if he could contact a family member or emergency services for Mr. Hargis. (<u>Id.</u> ¶ 7). Mr. Hargis told Masters that he wanted to see a doctor, but he did not want EMS called. (<u>Id.</u> ¶¶ 7, 9). He also told Masters "I have no friends. I have no money. My relatives don't want me and I don't want them." (<u>Id.</u>). During their conversation, Masters gave Mr. Hargis a bottle of water, which Mr. Hargis "smash[ed]" against his forehead. (<u>Id.</u> ¶ 10).

b.    **Transport and Detention of Mr. Hargis at Livingston Regional Hospital**

After Masters identified his patrol car, Mr. Hargis told Masters "you're going to take me to the doctor then," and then put himself in the patrol car. (Id. ¶ 12). Mr. Hargis "was not placed under arrest; he was not cuffed or restrained; and he was not forced into the patrol car." (Id. ¶ 13). Masters drove Mr. Hargis to the emergency room of Livingston Regional Hospital, and Johnson followed in his patrol car. (Doc. No. 64-3 (Johnson Decl.) ¶¶ 6-7).

Mr. Hargis was admitted to the hospital at 7:15 AM. (Doc. No. 67-4 (Livingston Regional Hospital Medical Record) at 2). Once Mr. Hargis arrived at the emergency room, Masters' bodycam footage captures Mr. Hargis's hospital visit.[1] The Court's description of Mr. Hargis's hospital visit is drawn from the bodycam video footage and, where they agree with the bodycam video footage, the Parties' undisputed facts.

After Mr. Hargis was admitted to the hospital (Doc. No. 67-4 (Livingston Regional Hospital Medical Record) at 2), the video shows that his behavior was erratic. He had a brief outburst when Masters asked him to enter an examination room. (Doc. No. 104, Manual Ex. to Doc. No. 64 (Bodycam Video 1) at 01:10 – 01:20). Mr. Hargis said "You're lying to me! F*** you!" but then quickly calmed down and entered the room as Masters had asked. (Id. at 01:10 – 01:50). Mr. Hargis "jabb[ed] [Masters] in the chest with his finger, touch[ed] his shoulder, and ruffl[ed] his hair." (Doc. No. 88 ¶ 17). He continued to cycle through periods of excitement followed by periods of calm when the nurses came to take his vitals. (Doc. No. 104, Manual Ex.

---

[1] When a video record exists, the Court "must view the facts in the light depicted by the videotape." Campbell v. Cheatham Cnty. Sheriff's Dep't, 511 F. Supp. 3d 809, 817 (M.D. Tenn. 2021), aff'd, 47 F.4th 468 (6th Cir. 2022), cert. denied sub nom. Fox v. Campbell, No. 22-848, 2023 WL 6377793 (U.S. Oct. 2, 2023) (quoting Green v. Throckmorton, 681 F.3d 853, 859 (6th Cir. 2012)). "[W]here a video blatantly contradicts a [party's] version of the facts, the Court cannot blindly defer to [that] version." McCart v. Jackson, 2023 WL 5353680, at *6 (M.D. Tenn. Aug. 18, 2023) (quoting Marvin v. City of Taylor, 509 F.3d 234, 249 (6th Cir. 2007)) (internal quotations omitted).

6

to Doc. No. 64 (Bodycam Video 1) at 02:50 – 05:00). "Mr. Hargis's speech was frequently incoherent; his thought process sometimes appeared disjointed and did not follow a logical progression . . . and he had hallucinations of a doctor walking by with a bottle of Mountain Dew." (Doc. No. 88 ¶ 19). For several minutes, he spoke in a soft and rambling manner to himself. (See, e.g., Doc. No. 104, Manual Ex. to Doc. No. 64 (Bodycam Video 2) at 03:30 – 05:00).

Mr. Hargis repeatedly requested a Sundrop or Mountain Dew soda and got upset when the nurses tried to draw his blood before he had received his soda. (Id. (Bodycam Video 2) at 08:24 – 10:00; (Bodycam Video 3) at 00:00 – 00:30). He formed a fist and, jesting, said to Officer Johnson or Laycock "[w]ant me to punch you in your – sock you in your jaw?" (Id.). Then he put his head in his hands, turned out the room light, and began shuffling his feet back and forth, continuing to request a drink. (Id.). Mr. Hargis also displayed inappropriate behaviors, at one point asking Masters to urinate in a Styrofoam cup and holding it toward Masters' genital area, (Doc. No. 88 ¶ 27), and at another point stating he was going to defecate on the floor if he did not get a Mountain Dew, (id. ¶ 24). However, for extended periods Mr. Hargis spoke calmly with the police officers about various mundane topics. (See, e.g., Doc. No. 104, Manual Ex. to Doc. No. 64 (Bodycam Video 3) at 00:31 – 03:30).

The medical records from 7:22 AM on March 29 state that Mr. Hargis's "[b]ehavior/mood is aggressive, delirious. Affect is animated. Patient has no thoughts/intent to harm self or others. Judgement/Insight is impaired. Delusions/hallucinations are present and described as talking to persons he describes but who are not present." (Doc. No. 67-4 at 3). The medical record documents Mr. Hargis's response during the examination:

> Have you wished you were dead or wish you could go to sleep and not wake up? Past month NO. In the past month have you actually had thoughts of killing yourself? NO. Have you ever done anything, started to do anything, and prepared

to do anything to end your life? NO.   Assessed Risk Score: No suicide risk identified for this patient.

(Id. at 2).

At some point during Mr. Hargis's hospital visit, Johnson radioed Officer Jeremy Laycock and asked him to bring a 6-401 Form from the police station to the hospital.  (Doc. No. 64-2 (Laycock Decl.) ¶ 2).  Laycock brought the form and then remained at the hospital to serve as additional backup for Masters and Johnson.  (Id. ¶ 3).  Laycock and Johnson stood outside the door to Mr. Hargis's examination room while Masters stayed in the room with Mr. Hargis.  (See id.; Doc. No. 88 ¶ 25 (screenshots from bodycam footage showing an officer outside the examination room)).

Dr. Karen Oldham is a physician working in the emergency department when Mr. Hargis was admitted.  She observed his interactions with the nurses but did not directly ask him any questions or examine him beyond having a laboratory technician draw blood and ordering routine tests.  (Doc. No. 88 ¶ 28; Doc. No. 67-6 at 8 (Oldham Dep. 24:12-25)).  Dr. Oldham completed a 6-401 Form, writing that Mr. Hargis exhibited "confusion, hallucinations and delusions."  (Doc. No. 67-1 at 54).  She signed the form at 7:24 AM, nine minutes after Mr. Hargis was admitted to the hospital.  (Id.; Doc. No. 67-4 at 2).

Dr. Oldham, the nurses who attended to Mr. Hargis, and Officers Masters, Johnson and Laycock determined that Mr. Hargis was behaving too aggressively to stay at the hospital during the involuntary commitment process.  (See Doc. No. 67-6 at 18 (Oldham Dep. 45:17-20)).  Moving Mr. Hargis to the Overton County Jail was consistent with the Livingston Police Department's and Overton County Jail's practice since at least December 2020.   (Doc. No. 96 ¶¶ 55-57, 60-61).  Oldham's understanding was that when Livingston Regional Hospital determines it cannot safely manage a person being held for involuntary commitment, that person is taken to the jail to be held.

(See Doc. No. 67-6 at 18 (Oldham Dep. 45:17-20)). This practice was memorialized in December 2020, when a Livingston Police Lieutenant, Logan Carpenter, met with the Overton County Sheriff's Department Chief Deputy, Timothy Poore, "to discuss how to proceed with mentally ill or disturbed individuals not charged with a crime." (Doc. No. 96 ¶ 54; Doc. No. 99 ¶ 89). Following this meeting, the Livingston Police Department and Overton County agreed that "when officers encountered a mental disturbed individual who is not certified 6404 and is combative, then with or without a corresponding arrest, officers would complete the 6401 form for involuntary hold at the jail without a warrant." (Doc. No. 96 ¶ 55; Doc. No. 99 ¶ 90 (internal quotations and citations removed)).[2] Their agreement is reflected in a memorandum sent to Livingston police officers, which states:

> To: All LPD Officers . . . When dealing with a mentally disturbed person or individual who is threatening to commit suicide, but they are not certified 6404 there is an updated process. When or if they become combative or commit assault on hospital personnel there is a form required for involuntary hold at the jail without a warrant. With or without a corresponding arrest the jail requires officers to fill out a 6401 form, which is in the form cabinet in the squad room for the jail's federal documentation. Please review and fill out the 6401 form in these cases, keep a copy for your file, and take the original to the jail.

(Doc. No. 85 at 3).[3] "The memorandum was distributed to [Livingston police] officers by hanging it on a bulletin board in or near the squad room and placing it in officers' individual boxes." (Doc. No. 96 ¶ 57).

---

[2] The Court understands the phrase "not certified 6404" to mean that a Certificate of Need pursuant to Tenn. Code Ann. § 33-6-404 has not been completed for the individual.

[3] Neither Ms. Hargis nor the Defendants included the language of the memorandum in their Statements of Undisputed Fact, but Ms. Hargis included a picture of the memorandum in her brief opposing the City Defendants' summary judgment motion. The Court presumes the language of the memorandum, as depicted in Ms. Hargis's brief, is accurate for summary judgment purposes. The Defendants do not suggest otherwise in the record.

9

Masters transported Mr. Hargis to the Overton County Jail just before 7:55 AM on March 29. (Id. ¶ 66; Doc. No. 64-1 ¶ 27).

### c. <u>Detention at the Overton County Jail</u>

Officer Masters arrived at the Overton County Jail with Mr. Hargis at 7:55 AM on March 29. (Doc. No. 72-1, Ex. 1 (Booking Video) at 07:55:00). Masters told Corrections Officers Amber Beaty and Dustin Pettit that Mr. Hargis "was being brought in as a mental health hold, that the doctor had signed off on it, and that Officer Johnson would be bringing the paperwork from the hospital." (Doc. No. 86 ¶ 6). Mr. Hargis was not handcuffed and appeared to be smiling and calm. (Doc. No. 72-1, Ex. 1 at 07:55:00 – 07:55:28). He was patted down over his clothing by Pettit. (Id., Ex. 1 at 07:55:29 – 07:55:49). He was then forcibly put into a booking cell by Beaty, Pettit, and Masters. (Id., Ex. 1 at 07:55:50 – 07:56:41).[4] Masters told the corrections officers that Mr. Hargis had "no charges right now . . . but the day's not over though." (Id. ¶ 7). Corrections Officer Melody Crawford booked Mr. Hargis into the jail using the code "0671-6401 HOLD," (Doc. No. 99 ¶ 114), which is used by the jail to detain mentally ill or disturbed individuals. (Doc. No. 99 ¶¶ 95-96).

At 1:22 PM on March 29, Mr. Hargis was taken to the jail nurse to be evaluated by a crisis counselor, Jesse Savage, and returned to his cell two minutes later. (Doc. No. 86 ¶ 10). After this

---

[4] County Defendants state that Beaty suffered a "severe sprained ankle" as the result of Mr. Hargis's resistance to being put in the booking cell, which Ms. Hargis does not dispute for purposes of summary judgment. (Doc. No. 86 ¶ 4). However, the videotape does not support County Defendants' assertion. <u>See McCart</u>, 2023 WL 5353680 at *6. Instead, the booking video shows that while he was being pushed into the cell, Mr. Hargis's left foot grazed Beaty's left foot. (Doc. No. 72-1, Ex. 1 at 07:56:05). After Mr. Hargis was in the cell, Beaty appears to lightly kick the cell door twice with her right foot to help close it. (Id., Ex. 1 at 07:56:31 – 07:56:37). She then walked away from the cell, limping slightly and lifting her right foot. (Id., Ex. 1 at 07:56:44 – 07:56:49).

two-minute evaluation, at 1:34 PM Savage wrote: "patient continues to speak to souls unseen. Took off his clothes and tied them in knots to hang himself. He still thinks everyone is trying to hurt him in some way." (Id. ¶ 12). There is also a notation written by Dr. Oldham directly after Savage's note: "I spoke to Jesse from Crisis and will write 6-404." (Doc. No. 67-4 at 3).

Savage also performed a crisis assessment via telehealth from 2:05 PM to 2:13 PM on March 29. (Doc. No. 67-5 (Crisis Assessment Form) at 2). He wrote:

> Presenting Problem: Ct brought to Overton Jail w/o charges due to psychotic Bx in LRH ER. Dispatch was original called at that time, but Ct transferred prior to eval. Ct has reportedly made threats to hang self, and focused on paranoia w/ "imaginary intruders" in ER. Per Jail nurse Darlene Ct has been undressing and tying a lasso w/ clothes, very agitated since arrival. Ct is unable to participate appropriately in eval. Ct is agitated w/ CRT and stating multiple times he told them about this electronic stuff. CRT asked Ct i[f] he could discuss why he is there. Ct reports he is about to be free. When asked what brought Ct to jail he states "you asking too many questions". Ct w/ word salad at times discussing his mouse, and bark of the tree. Ct refused to answer further questions for CRT and was escorted out of room by officers. CRT discussed w/ Dr. Oldham at ER, and was agreed Ct is unreliable to verbalize for safety. She signed 6404. Most info is unk[nown] due to Ct unable/refusing to participate.

(Id. at 3-4). Savage's opinion of Mr. Hargis's condition was:

> Final Disposition: Ct is unreliable to verbalize for safety. Ct being held at Overton Jail due to safety w/o charges. 6404 by Dr. Oldham. Ct referred t[o] MBMHI per Regina.

(Id. at 5). There is no 6-404 Form in the record before the Court.

Mr. Hargis was detained at the Overton County Jail to await involuntary admission to a mental health treatment center. (Doc. No. 70 at 12-13; Doc. No. 1 ¶¶ 69-70).[5] He died on March 30, 2021 following an incident at the jail and never made it to a treatment center.

---

[5] While the Parties do not dispute that Mr. Hargis was detained at the Overton County Jail, neither the Statements of Undisputed Facts nor Ms. Hargis's Additional Statements of Fact state that Mr. Hargis was being detained while awaiting admission to a mental health treatment center. However, both the Complaint, (Doc. No. 1 ¶¶ 69-70), and County Defendants' brief (Doc. No. 70 at 12-13) state this fact, so the Court accepts it as true. Furthermore, the record indicates that while Mr.

### III.    TUESDAY, MARCH 30, 2021

#### d.    <u>Mr. Hargis's Death</u>

The record before the Court, including the security camera videotape, tells the story of Mr. Hargis's death. The videotape provided to the Court has significant limitations. It contains no audio, and Mr. Hargis is blocked by corrections officers for a substantial portion of the video. Large portions of the video are not clear and create jury issues. The following description is based on what the Court can glean from the video and the record. The Court notes where significant factual disputes exist.

At 12:54 PM on March 30, Corrections Officers Christena Sakkinen and Samuel Webb "noticed that Hargis was bleeding, as he was attempting to claw his eyes." (Doc. No. 86 ¶ 15). At 12:56 PM, Corrections Officers David Nelson, Webb, and Pettit, and Lieutenant Donald Shaver attempted to remove Mr. Hargis from his cell and place him in a restraint chair. (Id. ¶¶ 16-17; Doc. No. 72-1, Ex. 2 (Incident Video) at 12:56:24). Mr. Hargis, who was naked, lunged out of his cell. (Id., Ex. 2 at 12:56:54 – 12:56:56). Shaver, Pettit, Nelson and Webb grabbed Mr. Hargis and took him to the ground, where he lay on his stomach with his hands, which were handcuffed in the front, over his head. (Id., Ex. 2 at 12:56:57 – 12:57:14). This is called a "prone" position.

Mr. Hargis lay in the prone position, not moving or resisting, for approximately one minute and twenty seconds. (Doc. No. 72-1, Ex. 2 at 12:57:15 – 12:58:34). During this time, Shaver, Pettit, and Nelson had their hands on Mr. Hargis. (Id.). Webb retrieved ankle shackles. (Id., Ex. 2 at 12:57:35 – 12:58:07). Then Webb, Pettit, and Nelson secured Mr. Hargis's ankles. (Id., Ex. 2 at 12:58:08 – 12:58:25). Pettit and Shaver next lifted Mr. Hargis into a kneeling position. (Id.,

---

Hargis was detained at the Overton County Jail, he was "referred t[o] MBMHI [Moccasin Bend Mental Health Institute]." (Doc. No. 67-5 at 5). A March 30, 2021 call log note further indicates that Mr. Hargis was "added to MBMHI wait list." (Id. at 6).

Ex. 2 at 12:58:29 – 12:58:38). Webb and Nelson, who did not have hands on Mr. Hargis at this time, remained close and watched Shaver and Pettit lift Mr. Hargis to his knees. (Id.). Due to the angle of the video camera, once Mr. Hargis was on his knees, his body was mostly obscured by Nelson's back. (Id., Ex. 2 at 12:58:39 – 12:58:43).

While Mr. Hargis was in the kneeling position, Sakkinen moved the restraint chair closer to Mr. Hargis. (Id., Ex. 2 at 12:58:42 – 12:58:46). At this point, Mr. Hargis lunged forward, (id., Ex. 2 at 12:58:44 – 12:58:46), and he was then again put into a prone position by Shaver, Pettit, and Nelson, after which Nelson and Pettit placed their hands on his arms and Shaver and Webb stood close by and observed Mr. Hargis (id., Ex. 2 at 12:58:46 – 12:58:49). Mr. Hargis remained in this position for approximately three minutes, during which he appeared to be still and did not appear to resist the officers. (Id., Ex. 2 at 12:58:49 – 01:01:39).

Nelson, Pettit, Shaver and Webb then tried again to lift Mr. Hargis. (Id., Ex. 2 at 01:01:39 – 01:01:52). Mr. Hargis began struggling with the four officers and resisting being put in the restraint chair. (Id., Ex. 2 at 01:01:53 – 01:02:01). The jail nurse, Darlene Grimsley, moved the restraint chair closer to Mr. Hargis, and Sakkinen came to stand behind the restraint chair. (Id., Ex. 2 at 01:02:04 – 01:02:14). Mr. Hargis then came to a seated position in front of the chair, with Nelson, Pettit, Webb and Shaver holding onto him. (Id., Ex. 2 at 01:02:14). The officers tried unsuccessfully again to put Mr. Hargis in the chair, and he resisted and ended up leaning on the chair, with his upper body, head and arms resting on the chair and his legs kneeling on the floor. (Id., Ex. 2 at 01:02:34 – 01:03:24). Around this time, Corrections Officer Melody Crawford entered the booking area, where she appeared to observe the incident from a few feet away. (Id., Ex. 2 at 1:03:08 – 01:03:19).[6]

---

[6] Crawford's body is obscured by the booking area desk throughout most of the video. (Id.).

13

Mr. Hargis remained kneeling against the restraint chair for approximately two minutes, not appearing to move or resist the officers. (Id., Ex. 2 at 01:03:24 – 01:05:29). During this time, Shaver, Nelson and Webb all had their hands on Mr. Hargis's upper body and arms. (Id.). Pettit briefly walked away and off camera but returned to the scene approximately one minute later. (Id., Ex. 2 at 01:03:39 – 01:04:32). When he returned to Mr. Hargis, Pettit also placed his hands on Mr. Hargis's upper body. (Id., Ex. 2 at 01:04:33). Shaver then left and returned approximately two minutes and forty-five seconds later. (Id., Ex. 2 at 01:05:22 – 01:07:09).

Mr. Hargis began to struggle with the officers again, though his movements are mostly obscured in the video by Webb's body so the Court cannot determine the extent of his resistance. (Id., Ex. 2 at 01:05:30). At this point, Pettit, Nelson, Webb, and Sakkinen all worked to restrain Mr. Hargis back into the kneeling position against the restraint chair. (Id., Ex. 2 at 01:05:31 – 01:05:42). The video does not clearly show where the officers' hands were placed on Mr. Hargis's body at this time or whether they were applying pressure. (Id.). Jail Administrator Amanda Poore and Corrections Officer Melissa Barnes then entered the booking area to assist the other officers. (Id., Ex. 2 at 01:05:25 – 01:05:43). After approximately another minute where he appeared to lie still across the chair, (id., Ex. 2 at 01:05:43 – 01:06:58), Mr. Hargis began to try to stand up, (id., Ex. 2 at 01:06:59 – 01:07:03). Pettit, Nelson and Webb tried to restrain him back down onto the chair. (Id.). During this struggle, Mr. Hargis fell onto his back and hit his head forcefully on the floor. (Id., Ex. 2 at 01:07:04 – 01:07:06). The Court cannot clearly discern from the video whether Mr. Hargis fell backward on his own or was taken to the ground by the officers. (Id.).

After Mr. Hargis hit his head and laid with his back on the ground, Nelson and Shaver put their hands on his chest, and Pettit briefly put one of his hands on Mr. Hargis's neck. (Id., Ex. 2 at 01:07:06 – 01:07:13). At this point, Webb stood up and removed his hands from Mr. Hargis,

but continued to stand over Mr. Hargis and observe the scene. (Id., Ex. 2 at 01:07:10). Mr. Hargis moved his hands to cover his face and Pettit put his right hand on Mr. Hargis's head. (Id., Ex. 2 at 01:07:18 – 01:07:49). Patrol Lieutenant Michael Tharp then entered the scene, apparently after Beaty noticed the incident on security cameras from her post in the tower, and radioed for additional assistance. (Id., Ex. 2 at 01:07:24 – 01:07:39; Doc. No. 86 ¶¶ 36-37). Mr. Hargis appeared to lay still on his right side with his hands covering his face for approximately one minute. (Doc. No. 72-1, Ex. 2 at 01:07:19 – 01:08:24). During this time, Crawford and Barnes appeared to wipe Mr. Hargis's lower body and the restraint chair with toilet paper or paper towels. (Id.). Shaver, Sakkinen, Webb, and Nurse Grimsley observed while Nelson, Pettit, and Tharp had their hands on Mr. Hargis. (Id.).

Mr. Hargis moved from lying on his side to the prone position. It is not clear whether the officers placed him in the prone position or Mr. Hargis put himself in that position. Once he was in the prone position, Nelson and Pettit held Mr. Hargis's arms over his head and put their hands on his neck and Tharp held Mr. Hargis's lower body. (Id., Ex. 2 at 01:08:31 – 01:09:28). Mr. Hargis appeared to try to sit up, and Nelson, Pettit and Tharp use force to restrain him. (Id., Ex. 2 at 01:09:36 – 01:11:19). Webb, who was observing, obscured Mr. Hargis's body from the camera for nearly two minutes at this point, and the Court cannot discern Mr. Hargis position or movements during that time. (Id.). Mr. Hargis was laying on his left side with his arms and hands out in front of him when Webb moved out of the camera's line of sight. (Id., Ex. 2 at 01:11:20 – 01:11:25). Pettit's hands were on Mr. Hargis's wrists. (Id., Ex. 2 at 01:11:25 – 01:11:42).

The Parties dispute the next critical moments. The County Defendants claim that "Hargis was laying on his left side, then suddenly moved onto his stomach and pulled his hands out in front of him . . . caus[ing] Pettit to be pulled over on top of Hargis's torso." (Doc. No. 71 ¶¶ 46-47).

15

Ms. Hargis contends that "[a]vailable surveillance footage shows Officer Pettit sliding his right knee outward and moving Mr. Hargis's hands to Officer Pettit's right-hand side in a sweeping motion." (Doc. No. 86 ¶ 46). She further contends that "The other officers can be seen assisting Officer Pettit in moving Mr. Hargis into this prone position." (Id. ¶ 47). She disputes that Mr. Hargis pulled Pettit on top of him, stating that "it was impossible for Mr. Hargis to have pulled Officer Pettit onto his back. The only feasible way Mr. Hargis could have pulled Officer Pettit on top of him is if Mr. Hargis had been lying on his right side instead." (Id.). The Court has watched the video of the incident many times, (Doc. No. 72-1, Ex. 2 at 01:11:31 – 01:11:51), and finds that a reasonable factfinder could agree or disagree with either party's interpretation. Because the Court is obligated to view the facts in the light most favorable to the non-moving party, the Court accepts Ms. Hargis's version, that Pettit and the other officers moved Mr. Hargis into the prone position. See Tolan, 572 U.S. at 651.

When the officers moved Mr. Hargis into the prone position, Pettit fell on top of Mr. Hargis's upper body because his fingers were stuck in Mr. Hargis's handcuffs. (Doc. No. 72-1, Ex. 2 at 01:11:44 – 01:11:49). Pettit stayed on top of Mr. Hargis's upper body for approximately two minutes. (Id., Ex. 2 at 01:11:49 – 01:13:44). During most of this time, Tharp and Shaver held Mr. Hargis's calves and ankles, Webb held his forearms, Nelson held his lower torso down, and Pettit continued to lay across his upper torso. (Id.). After Pettit had been laying across Mr. Hargis's upper body for more than a minute, Sakkinen, Barnes and Nelson began to assist in untangling his fingers from Mr. Hargis's handcuffs. (Doc. No. 72-1, Ex. 2 at 01:12:54 – 01:13:44). At some point during this time, Tharp noted that Mr. Hargis's breathing sounded labored. (Doc. No. 86 ¶ 62; Doc. No. 89-13 at 40 (Tharp Dep. 84:18-23)).

Here, the parties dispute another material fact, and the Court finds that a jury could interpret the video according to either party's position. The County Defendants say that while Pettit was lying across Mr. Hargis's body, "Nelson and Pettit tried to raise [Pettit's] body off Hargis while the other officers attempted to get his fingers unstuck." (Doc. No. 71 ¶ 50). Ms. Hargis disagrees, stating that the video shows no such attempts. (Doc. No. 86 ¶ 50).

After Pettit became unstuck, Webb, Barnes, Nelson, Tharp, and Poore continued to physically restrain Mr. Hargis while he lay on the floor. (Id., Ex. 2 at 01:13:47 – 01:15:16). Shaver and Sakkinen watched. (Id.). After approximately another ninety seconds of holding Mr. Hargis in the prone position, the officers noticed he was not moving and turned him over onto his back. (Id., Ex. 2 at 01:15:16 – 01:15:21). At this point Shaver and Barnes tried to wake him by tapping his feet and face and doing a sternum rub. (Id., Ex. 2 at 01:15:21 – 01:17:14). When that did not work, Nurse Grimsley began life-saving efforts. (Id., Ex. 2 at 01:17:08 – 01:20:59). He was then taken by emergency medical services to Livingston Regional Hospital. (Id., Ex. 2 at 01:20:59 – 01:22:22).

Mr. Hargis later died after being transferred to Tristar Hospital. (Doc. No. 62-5 at 20 (Oldham Dep. 72:5-13)). His autopsy states that the cause of death was asphyxiation, and the manner of his death was homicide. (Doc. No. 99 ¶ 116).

## LEGAL STANDARD

Summary judgment is appropriate only where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears "the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003). If the moving party

meets that burden, the burden shifts to the party opposing summary judgment who "must then set forth the specific facts showing that there is a genuine issue for trial." Id. (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986) (internal quotations omitted). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). In discerning whether a material dispute exists, "a court must view the evidence in the light most favorable to the opposing party." Tolan v. Cotton, 572 U.S. 650, 657 (2014) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)) (internal quotations omitted). "[A] judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Tolan, 572 U.S. at 657.

## ANALYSIS

Ms. Hargis brings federal claims pursuant to 42 U.S.C. § 1983 ("Section 1983") and state law false imprisonment, assault, and battery claims against the Defendants. The Defendants have moved to dismiss all the claims. The Court addresses each claim in turn.

### I. Federal Claims Brought Pursuant To Section 1983

A valid Section 1983 claim must establish two elements: "(1) deprivation of a right secured by the Constitution of laws of the United States (2) caused by a person acting under color of state law." Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ., 542 F.3d 529, 534 (6th Cir. 2008) (citing McQueen v. Beecher Cmty. Sch., 433 F.3d 460, 463 (6th Cir. 2006)).

Qualified immunity is a defense to a Section 1983 claim. "The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." Pearson v. Callahan, 555 U.S. 223, 244 (2009). "In resolving

18

questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry." Tolan, 572 U.S. at 655. They are: 1) whether "the official's conduct violated a clearly established constitutional right," Pearson, 555 U.S. at 232; and 2) "whether the right in question was clearly established at the time of the violation," Tolan, 572 U.S. at 656 (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)) (internal quotations removed). "Courts have discretion to decide the order in which to engage these two prongs." Tolan at 656 (quoting Pearson, 555 U.S. at 236).

The plaintiff bears the burden of proving that a right is "clearly established." Everson v. Leis, 556 F.3d 484, 494 (6th Cir. 2009) (citing Barrett v. Steubenville City Sch., 388 F.3d 967, 970 (6th Cir. 2004)). Courts look first to Supreme Court precedent, then to Sixth Circuit precedent, and then to decisions of other courts of appeal to determine if the right is clearly established. See Barber v. Miller, 809 F.3d 840, 845 (6th Cir. 2015). "[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." Tolan, 572 U.S. at 656. So, "[i]n evaluating if a defendant is entitled to qualified immunity, the Court must adopt the plaintiff's version of the facts . . . unless the plaintiff's version is blatantly contradicted by the record, so that no reasonable jury could believe it." Judd v. City of Baxter, Tennessee, No. 2:16-cv-00062, 2018 WL 3157208, at *1-2 (M.D. Tenn. Jun. 27, 2018), aff'd, 780 F. App'x 345 (6th Cir. 2019) (quoting Soudemire v. Mich. Dept. of Corr., 705 F.3d 560, 565 (6th Cir. 2013)) (internal quotations omitted).

## A.      False Imprisonment

Ms. Hargis alleges the following on behalf of her brother:

FIRST CAUSE OF ACTION: Section 1983 Claim for False Arrest & False Imprisonment Against Livingston Defendants

19

SECOND CAUSE OF ACTION: Municipal Liability Pursuant to Section 1983 and <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978) for Livingston Defendants' Violations of Civil Rights Against the City of Livingston

THIRD CAUSE OF ACTION: Section 1983 False Imprisonment Claim Against Dustin Pettit, Amber Beaty, and Amanda Poore

FOURTH CAUSE OF ACTION: Municipal Liability Pursuant to Section 1983 and <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978) for Dustin Pettit, Amber Beaty, and Amanda Poore's Violation of Plaintiff's Constitutional Rights Against Overton County

The Court will first address the claims against the individual City and County Defendants and will then address the municipal liability claims against the City of Livingston and Overton County.

### 1.    Individual City and County Defendants

Ms. Hargis brings false imprisonment claims against the individual City and County Defendants under both the Fourth Amendment and the Fourteenth Amendment. She alleges that "[b]y arresting and detaining Jonathan Mark Hargis at the Overton County Jail without any criminal charges and without probable cause, the [individual City] Defendants subjected Mr. Hargis to false arrest and false imprisonment in violation of his Fourth Amendment right to be free from unreasonable seizure." (Doc. No. 1 ¶ 139). The same allegations are made against individual County Defendants Poore, Pettit, and Beaty. (<u>See id.</u> ¶ 159). She separately alleges that "[b]y denying Jonathan Mark Hargis the process to which he was entitled pursuant to [Tennessee law], the [individual City] Defendants deprived Mr. Hargis of liberty interest secured and/or guaranteed by Tennessee law . . . in violation of his Fourteenth Amendment right to due process." (<u>Id.</u> ¶ 140). Further, she avers that these Defendants "deprived Mr. Hargis of liberty interests also guaranteed by federal constitutional law, including but not limited to freedom of movement, freedom from

20

undue restraint, and/or the right to adequate medical care," (id. ¶ 141). Again, she makes similar allegations against Poore, Pettit and Beaty. (Id. ¶¶ 162-64).

The City Defendants seek dismissal of the false imprisonment claims against Officers Masters, Laycock and Johnson because Mr. Hargis voluntarily went to the hospital for evaluation and the officers had probable cause to detain him to evaluate his mental health "at every stage of his encounter with Livingston police." (Doc. No. 65 at 14). They further argue that Mr. Hargis's substantive or procedural due process rights under the Fourteenth Amendment were not violated because their actions conformed with Tennessee's involuntary commitment statute, (id. at 10-13), and because "[t]he Sixth Circuit does not appear to have adopted any requirement that a detention [of a mentally ill person] must [be] held at the least restrictive alternative location," (id. at 17). Ms. Hargis responds that whether the officers had probable cause to detain Mr. Hargis for a "mental health seizure" is "not what is at issue in this case. . . . Instead, what is at issue is Plaintiff's assertion that the [police] officers lacked probable cause or other legal justification to detain Mr. Hargis at the Overton County Jail." (Doc. No. 87 at 12). Ms. Hargis further argues that because Mr. Hargis was not under arrest and the officers did not have probable cause to believe he committed any crime, they violated his Fourth Amendment rights when they "arrange[d] [his] jailing." (Id. at 13).

The County Defendants urge dismissal of Jail Administrator Poore and Corrections Officers Pettit and Beaty because they "were entitled to believe that the [police] officers had probable cause to bring Hargis to jail based on Master conveying he was a mental health hold, the doctor had signed off on it, and that charges may be coming." (Doc. No. 70 at 11). They additionally argue that the County Defendants did not violate Mr. Hargis's Fourteenth Amendment rights because Tennessee's involuntary commitment statute does not create a federal due process

right, (id.), and regardless, the County Defendants did not violate Tennessee's involuntary commitment law, (id.). Ms. Hargis responds that the County Defendants violated Mr. Hargis's Fourth Amendment rights when they booked him into the Overton County Jail because they did not have probable cause to believe he had committed a crime. (Doc. No. 85 at 15). She further argues that, contrary to the County Defendants' arguments, Tennessee's involuntary commitment statute does create a protected federal due process right, and the County Defendants violated that right by not adhering to the statute in detaining Mr. Hargis. (Id. at 17). She urges the Court to follow the Eleventh Circuit in holding that "emergency mental health detainees enjoy[] procedural and substantive due process rights requiring detention at hospitals or mental health facilities, not jails." (Id.).

The Court addresses Ms. Hargis's Fourth Amendment and Fourteenth Amendment Section 1983 claims in turn.

### a. Fourth Amendment

Both the City and the County Defendants argue they are entitled to qualified immunity on the Fourth Amendment claims. (Doc. No. 65 at 14; Doc. No. 70 at 8-9). The Court first examines whether Mr. Hargis had a clearly established constitutional right at the time of his detention, and whether the Defendants' conduct, viewing the facts in the light most favorable to Ms. Hargis, violated that right. Tolan, 572 U.S. at 655-56.

In 1997, the Sixth Circuit clearly established that right: "The Fourth Amendment requires an official seizing a person for a psychiatric evaluation to have probable cause to believe that the person is dangerous to himself or others." Monday v. Oullette, 118 F.3d 1099, 1102 (6th Cir. 1997). In Monday, the Sixth Circuit analogized a "dangerous mental health condition . . . to the role of criminal activity in traditional Fourth Amendment analysis," and concluded that "a showing

22

of probable cause in the mental health seizure context requires only a probability or substantial chance of dangerous behavior, not an actual showing of such behavior." Id. (citing Illinois v. Gates, 462 U.S. 213, 245 n.13 (1983)). The Sixth Circuit has held steadfast to this legal standard for more than two decades. See, e.g., Simon v. Cook, 261 Fed. App'x 873, 879 (6th Cir. 2008) (collecting Sixth Circuit and other Circuit Court cases); Machan v. Olney, 958 F.3d 1212, 1214 (6th Cir. 2020). This right was "clearly established" on March 29, 2021.

The Court must now determine if the record contains facts that demonstrate that the individual Defendants' conduct violated Mr. Hargis's Fourth Amendment right. The threshold factual issue is whether Mr. Hargis was seized. The answer is yes. "A seizure occurs when a reasonable person would not feel free to leave an encounter with the police." Massey v. Hess, 2007 WL 2725890, at *7 (E.D. Tenn. Sep. 17, 2007) (citing Florida v. Bostick, 501 U.S. 429, 439 (1991)). There is no dispute that when Masters spoke to Mr. Hargis along the side of the road on the morning of March 29, 2021, Mr. Hargis asked Masters to take him to the doctor. (Doc. No. 88 ¶¶ 12-13). Then, on his own, Mr. Hargis got into Masters' car without any constraints. (Id.). Masters then drove Mr. Hargis to the emergency room as requested. (Id.). There is no evidence before the Court that Mr. Hargis was not free to leave Masters. To the contrary, because Mr. Hargis requested a ride and then willingly went with Masters to the hospital, Masters did not detain Mr. Hargis when he drove him to the hospital. See Massey, 2007 WL 2725890, at *7 (finding no seizure where plaintiff voluntarily rode with police to be questioned and the police "never said or did anything to create th[e] impression" that she was not free to leave).

At the emergency room, Mr. Hargis exhibited periodic spontaneous outbursts and signs of discontent, including by apparently playfully threatening to "sock" a police officer if he didn't get him a soda, slamming his fist on a hospital bed, and turning out the lights to his room and putting

23

his head in his hands. (Doc. No. 104, Manual Ex. to Doc. No. 64 (Bodycam Video 2) at 08:24 – 10:00; (Bodycam Video 3) at 00:00 – 00:30; see also Doc. No. 88 ¶¶ 21-22, 25). Masters remained in the hospital room with Mr. Hargis the entire time. (Id. ¶¶ 16-27; see generally Doc. No. 104, Manual Ex. to Doc. No. 64 (Bodycam Videos 1-5)). Johnson and Laycock remained just outside the hospital room. (See Doc. No. 64-2 ¶ 3; Doc. No. 64-3 ¶ Doc. No. 66 ¶ 25). While the Court cannot pinpoint the precise time at which Mr. Hargis was no longer voluntarily at the hospital, the Court determines that due to his behavior between his 7:15 AM arrival at the emergency room and his 7:55 AM arrival at the Overton County Jail, Mr. Hargis was no longer free to leave. He was seized by Masters because of his erratic behavior that suggested that he may be a threat to himself or others.

The question for the Court then becomes: did Officer Masters have probable cause to detain Mr. Hargis at the hospital for an involuntary mental health evaluation and potential commitment to a treatment center? The Court notes that Ms. Hargis admits she "has never disputed that the [police] officers had probable cause on March 29, 2021, to suspect that Mr. Hargis had a mental illness or serious emotional disturbance requiring examination at a hospital or treatment resource . . ." (Doc. No. 87 at 12). The Court agrees that the record before the Court supports her admission.

Whether an "officer had probable cause is considered objectively from the officer's position at the time of the [seizure]." Reeners v. Troup, 2017 WL 9718575, at *9 (M.D. Tenn. Aug. 11, 2017). The Court considers only Mr. Hargis's behavior prior to his transport to the Overton County Jail in determining whether Masters had probable cause to detain him.

There is admissible evidence that Masters had knowledge of Mr. Hargis's aberrant behavior on March 29, 2021. Masters was dispatched to investigate "an unruly person" at a gas station who had "caused a disturbance in the store by yelling and cursing at customers, exited the

24

store and kicked a dumpster, and intimidated two customers outside who left without buying gas."
(Doc. No. 88 ¶ 3). At the hospital, in Masters' presence, Mr. Hargis exhibited some signs of
hallucination and delusional thinking, (Doc. No. 88 ¶ 19), as well as excited behavior. For
example, he clenched his fist and playfully threatened to "sock" a police officer, slammed a
hospital bed, and jumped up and down and tried to touch the ceiling light. (Doc. No. 104, Manual
Ex. to Doc. No. 64 (Bodycam Video 2) at 08:24 – 10:00; (Bodycam Video 1) at 04:34 – 04:50;
see also Doc. No. 88 ¶¶ 21-22, 25). While much of Mr. Hargis's behavior was simply bizarre or
obnoxious, he also exhibited outbursts and behaved unpredictably. (See id. ¶¶ 16-18, 20, 24, 27).
Masters knew that Mr. Hargis was not at risk for suicide and stated he did not wish to harm himself
or others. (Doc. No. 67-4 at 2-3; Doc. No. 104, Manual Ex. to Doc. No. 64 (Bodycam Video 2) at
00:22 – 00:40). In fact, when Mr. Hargis arrived at the Overton County Jail, he was calm, smiling,
and not handcuffed or physically restrained by Masters. (Doc. No. 72-1, Ex. 1 at 07:55:00 –
07:55:28). He complied with a pat-down and only began to struggle with officers toward the end
of this pat-down when they forcibly put him into a booking cell. (Id., Ex. 1 at 07:55:29 – 07:56:41).

Masters was present for Dr. Oldham's examination of Mr. Hargis and knew she completed
a 6-401 Form. (See Doc. No. 64-1 (Masters Decl.) ¶ 27). The Court has reviewed that 6-401 Form
and finds that it did not provide probable cause for Mr. Hargis's seizure. The form does not
document any aggressive behavior or state that Mr. Hargis was at risk of harming himself or others;
it only says "confusion, hallucinations and delusions." (Doc. No. 67-1 at 54). Setting aside its
content, the 6-401 Form is problematic because Dr. Oldham completed it only nine minutes after
Mr. Hargis arrived at the emergency room, and she did not personally question or examine Mr.
Hargis other than by observing his interactions with nurses. (Doc. No. 85 ¶ 28; Doc. No. 67-6 at
8 (Oldham Dep. 24:12-25); see also Doc. No. 104, Manual Ex. to Doc. No. 64 (Bodycam Video

2) at 08:23 – 09:37).  Masters knew this because he was with Mr. Hargis the entire time he was at the hospital.

Nor does the Court find Dr. Oldham's intention to sign a Certificate of Need relevant to the probable cause analysis or sufficient to establish probable cause.  Mr. Hargis's medical records make at least three references to a "6404" or Certificate of Need.  Despite the references to a 6-404 Form in the record, none of the Parties included a completed Certificate of Need for Mr. Hargis in the record before the Court, and Ms. Hargis claims "[n]either Dr. Oldham, Livingston Regional Hospital, nor Volunteer Behavioral Health is in possession of, or has produced . . . any such '6404' form, *i.e.* the Certificate of Need." (Doc. No. 88 ¶ 37).  A jury must determine whether a Certificate of Need was ever completed for Mr. Hargis and how much weight it deserves.

Moreover, the record does not show any intention, by anyone, to complete a Certificate of Need until, at the earliest, 1:34 PM on March 29.  (Doc. No. 67-4 at 3).  By that time, Mr. Hargis had already been detained for more than five-and-a-half hours at the Overton County Jail.  There is no evidence in the record that Masters knew Dr. Oldham intended to complete a Certificate of Need.  Moreover, a Certificate of Need must be completed by a "licensed physician, psychologist, or designated professional," Tenn. Stat. Ann. § 33-6-404, who personally examined the individual being involuntarily evaluated.  See Vickroy v. Pathways, Inc., 2004 WL 3048972, at *1 (Tenn. Ct. App. Dec. 30, 2004) (holding that Tennessee's involuntary commitment statute "requires that a physician or designated professional who commits a patient to a mental institution must first personally examine the patient, rather than relying exclusively on medical records or someone else's examination of the patient").  Had Dr. Oldham completed the Certificate of Need, it would have been based upon her phone conversation with Savage concerning Savage's observations of Mr. Hargis.  (Doc. No. 67-4 at 3).  See Vickroy, 2004 WL 3048972, at *1.  And while the record

before the Court does not contain undisputed facts necessary to determine whether Jesse Savage

of the crisis assessment team is a licensed physician, psychologist, or designated professional who

could have completed a Certificate of Need,[7] Savage's observations were limited to his 1:34 PM

note (based on a two-minute examination) and an eight-minute "telehealth appointment." (See

Doc. No. 67-5 at 2). Like Dr. Oldham's emergency room observations of Mr. Hargis, Savage's

observations give the Court pause regarding the quality of the assessment of Mr. Hargis's mental

condition.

In Reeners v. Troup, the Middle District of Tennessee was presented with a similarly

barebones medical assessment of a seized individual's mental state. There, the Court explained:

> Dr. Bradley's testimony is also irrelevant to establish the requisite probable cause
> in this case. First, the Officers' determination of probable cause, made hours before
> Dr. Bradley examined Reeners, was not based on anything Bradley did or said.
> Moreover, Bradley clearly testified that he accepted [the crisis counselor's]
> assessment and that his role was to conduct a "medical screening exam" on the
> patient, "which is a limited medical assessment to determine if there's any
> dangerous or life-threatening illness present" and to rule out a medical cause for the
> psychiatric condition as assessed by [the crisis counselor]. He apparently completed
> the certificate of medical need for involuntary commitment—before he ever saw
> Reeners—based solely on the information provided to him by Mobile Crisis. Thus,
> he simply ratified or adopted [the crisis counselor's] prior determination that
> Reeners posed a risk of harm to himself or others. . . . His completion of the
> Certificate of Need therefore contributes nothing to the probable cause equation.

Reeners v. Troup, No. 3:15-CV-00625, 2020 WL 409746, at *18 (M.D. Tenn. Jan. 23, 2020)

(internal citations omitted). The assessment of Mr. Hargis was in fact far more trifling than the

assessment of Reeners. In that case, the crisis counselor met face-to-face with Mr. Reeners for

approximately an hour, then discussed her observations of his mental state with her supervisor

before completing the 6-401 Form. Id. at *6-7. In stark contrast, Dr. Oldham's and Savage's nine-

---

[7] See Tenn. Code Ann. § 33-6-427 (describing credentials required of non-physicians); § 33-1-101 (defining "qualified mental health professional").

minute and two- and eight-minute evaluations of Mr. Hargis, respectively, do not pass the test for an adequate "examination."

Without considering the 6-401 Form or examinations, the Court still finds that Mr. Hargis's unpredictable outbursts coupled with his hallucinations and disorganized thinking created probable cause for Masters to believe he was dangerous to himself or others.  See Monday, 118 F.3d at 1102.  "A showing of probable cause in the mental health seizure context does not require an actual showing of dangerous behavior. . . . It is enough that [the officer] had information such that a reasonable person in the officer's opposition would believe it probable that [the seized individual] was a danger to h[im]self or others."  Ziegler v. Aukerman, 512 F.3d 777, 784 (6th Cir. 2008) (citing Monday, 118 F.3d at 1102).

After conducting a review of the Sixth Circuit's precedent concerning Section 1983 Fourth Amendment claims, the Court has not found—and Ms. Hargis has not cited—a case that directly mirrors Mr. Hargis's circumstance.  However, the Court finds the circumstances described in Simon v. Cook, 261 F. App'x 873, 880–81 (6th Cir. 2008), to be most instructive.  In Simon, the Sixth Circuit wrote:

> [T]he undisputed facts indicate that Simon demonstrated a high level of irrationality and a relatively low level of dangerousness. That is, his undisputed statements indicated that he believed that various government officials were harassing him and that the police had attacked him in the past. At the same time, mere finger-pointing presents a very low level of dangerousness. We understand that there is a difference between facts indicating mental illness and merely obstreperous behavior, and we are reluctant to set the bar for probable cause so low that the merely obnoxious are detained for mental evaluation. . . . However, that said, probable cause requires only a probability or substantial chance of dangerous behavior based on the circumstances of each case. Even if Simon did not present a substantial chance of immediate danger to [Police Officer] Cook, his stated intent to follow the police and get to the bottom of the alleged attacks against him indicated a substantial chance of irrational and dangerous behavior in the near future. While such a statement might not suffice on its own, we must view the statement in the context of Simon's apparently paranoid statements about the police. Thus, taken together, Simon's words and actions created probable cause to believe that Simon was

28

mentally ill and dangerous. Moreover, the fact that [the examining physician's] conclusions dovetail with Officer Cook's conclusions is further evidence that Cook's judgment was objectively reasonable. Given the existence of probable cause, Officer Cook's decision to detain Simon for a mental evaluation was not a constitutional violation.

Simon, 261 F. App'x at 880–81 (internal quotations and citations omitted).

To be sure, there are differences between the Simon case and this one. Simon exhibited more concerning delusions than Mr. Hargis and said he intended to follow the police and investigate unsubstantiated "attacks" against him. Id. Mr. Hargis's delusions or hallucinations were disorganized and focused mostly on his desire for a Mountain Dew. (Doc. No. 88 ¶ 19). And while the Sixth Circuit found a doctor's assessment of Simon to provide further evidence of the police officer's objective reasonableness, Simon, 261 F. App'x at 881, in this case there was no adequate medical examination for Officer Masters to rely upon. That said, Mr. Hargis was more unpredictable and excited than Simon, who simply pointed his finger in the police officer's face. Id. at 880-81. In sum, if the Sixth Circuit determined probable cause existed when it upheld the grant of qualified immunity to the officer in Simon v. Cook, the Court finds, based on the totality of the facts presented, that probable cause existed here, too.

Ms. Hargis argues that her Fourth Amendment claim is based on Mr. Hargis's detention at a jail and not a hospital or treatment resource. (Doc. No. 87 at 12). She argues that instead of determining whether officers had probable cause to make a "mental health seizure" of Mr. Hargis, the Court should evaluate whether the officers had probable cause to arrest Mr. Hargis. (Id. at 12-13). The Court disagrees. Mr. Hargis was not arrested. The well-established line of cases "clearly establish[ing] that, absent probable cause to believe that an offense ha[s] been committed, was being committed, or was about to be committed, officers may not arrest an individual," (id. at 13 (quoting Radavansky v. City of Olmsted Falls, 395 F.3d 291, 310 (6th Cir. 1995)), does not apply here. Nor does Ms. Hargis offer any precedential Supreme Court or Sixth Circuit cases to support

29

her contention that an individual's Fourth Amendment rights are violated when he is subject to a mental health seizure and is detained at a jail while awaiting admission to a treatment facility. (See Doc. No. 87 at 11-15).    Ms. Hargis has the burden of demonstrating that Mr. Hargis's Fourth Amendment right not to be detained at a jail on a mental health hold is clearly established.  See Everson v. Leis, 556 F.3d 484, 494 (6th Cir. 2009).  She has not met that burden.  See Dolbin v. Miller, 786 Fed. App'x 52, 57 (6th Cir. Sep. 26, 2019) ("Dolbin cannot identify a single controlling precedent finding a Fourth Amendment violation under similar enough circumstances to put the question beyond doubt.  That is fatal to his attempts to defeat qualified immunity.").

The Court must assess the qualified immunity of each individual defendant subject to Ms. Hargis's Section 1983 Fourth Amendment claims.  See Brown v. Knapp, 75 F.4th 638, 647 (6th Cir. 2023).  The undisputed facts are that Officer Masters is the police officer who seized Mr. Hargis.  Masters had probable cause to believe that Mr. Hargis was "dangerous to himself or others," Monday, 118 F.3d at 1102, so he is entitled to qualified immunity.

Officer Johnson was Officer Masters' "backup" during the dispatch to Mr. Hargis and while at the hospital.  (Doc. No. 64-3 ¶ 2).  Mr. Hargis did not travel in Johnson's car.  (Doc. No. 67-3 at 11 (Johnson Dep. 96:6-25)).  Johnson only minimally interacted with Mr. Hargis and let Masters take the lead because he was attempting to establish rapport with Mr. Hargis.  (Id.). Johnson also took the 6-401 Form from Dr. Oldham and brought it to the Sheriff's Department. (Doc. No. 64-3 ¶ 11).  Officer Johnson is entitled to qualified immunity for the same reasons Officer Masters is entitled to it.

Officer Laycock is also entitled to qualified immunity.  His role in the incident was limited to bringing an empty 6-401 Form to the hospital and then staying at the hospital to "simply show

30

'officer presence' and to create an obstacle to prevent Mr. Hargis from leaving the exam room during an outburst."  (Doc. No. 64-2 ¶¶ 2, 11).

Because Mr. Hargis had already been seized when he arrived at the Overton County Jail, Jail Administrator Amanda Poore and Corrections Officers Dustin Pettit and Amber Beaty cannot be liable for his seizure, and they are entitled to qualified immunity.  See Conatser v. Fentress County, Tennessee, 2018 WL 3364346, at *3 (M.D. Tenn. Jul. 10, 2018) (finding that plaintiff "cannot establish a false arrest claim against the Jamestown officials [because] the Jamestown officials' sole role in the illegal arrest of Linda Conatser was escorting her to the police car. She had already been seized—indeed, arrested—by the county, and was in county custody at that time.").

### b.    Fourteenth Amendment

Ms. Hargis contends that the City and County Defendants violated her brother's right to Due Process under the Fourteenth Amendment when they failed to follow Tennessee's involuntary commitment statute and detained him at Overton County Jail.  (Doc. No. 1 at ¶¶ 140, 147, 162, 169).  The Defendants maintain that Tennessee statutes do not create federal rights protected by the Fourteenth Amendment.  (Doc. No. 70 at 11; Doc. No. 65 at 16-19).  The Defendants are only half right because they ignore an exception to that rule.  State laws do not create federally protected liberty interests *except when* "(1) the state [law] places substantive limitations on official conduct by using explicitly mandatory language in connection with requiring specific substantive predicates, and (2) the state law requires a specific outcome if those substantive predicates are met."  Fields v. Henry Cnty., Tenn., 701 F.3d 180, 185–86 (6th Cir. 2012) (quoting Gibson v. McMurray, 159 F.3d 230, 233 (6th Cir.1998) (internal quotation marks omitted)).

For instance, in <u>E.J. v. Templeton</u>, No. 3:16-CV-01975, 2017 WL 4682503, at *6 (M.D. Tenn. Oct. 18, 2017), this Court examined a juvenile detention statute that stated:

> If a child alleged to have committed a delinquent or unruly act is brought before the court or delivered to a detention facility designated by the court, the intake or other authorized officer of the court shall immediately make an investigation and release the child unless it appears that such child's detention is warranted or required under § 37-1-114.

Tenn. Code Ann. § 37-1-117(a). The Court held that the statute created a liberty interest because it required juveniles to be released pending a detention hearing except under specific circumstances enumerated in §37-1-114 of the statute. <u>E.J.</u>, 2017 WL 4682503 at *6.

Conversely, in <u>West v. Kentucky Horse Racing Commission</u>, 972 F.3d 881 (6th Cir. 2020), the Sixth Circuit concluded that a horse racing commission regulation did not create any liberty interest for owners of competing horses because the regulation was replete with commission discretion:

> The regulation that governs "fouls" during a race, provides that "[i]f in the opinion of the stewards a foul alters the finish of a race, an offending horse may be disqualified by the stewards." . . . This provision does not give the [plaintiffs] a legitimate entitlement to the benefits of winning the Derby or limit the stewards' discretion in determining who the winner is. Rather, it grants the stewards broad discretion in determining whether a foul "alter[ed] the finish of a race," and if, in the stewards' "opinion" it did, then the stewards "may" (not "shall") disqualify the horse.

<u>Id.</u> at 890 (internal citations omitted).

Tennessee's involuntary commitment statute, Tenn. Stat. Ann. § 33-6-401 *et seq.*, contains both discretionary ("may") and mandatory ("must" or "shall") language. Ms. Hargis argues that the statute creates a protected liberty interest for mentally ill persons not charged with crimes to not be detained in jails. (<u>See</u> Doc. No. 85 at 18). Indeed, Tenn. Code Ann. § 33-6-425 states: "No defendant shall be detained at a jail or other custodial facility for the detention of persons charged with or convicted of criminal offenses, unless the defendant is under arrest for the

32

commission of a crime." The Court agrees with Ms. Hargis that this provision places a substantive limitation on police departments and sheriffs' departments by prohibiting them from jailing any person who meets the following "specific substantive predicates": 1) the person "has a mental illness or serious emotional disturbance" and "poses an immediate substantial likelihood of serious harm," § 33-6-401; 2) the person is detained "for immediate examination . . . for certification of need for care and treatment," § 33-6-402; and 3) the person is not "under arrest for the commission of a crime," § 33-6-425.

The Court must determine when this protected liberty interest attaches. The County Defendants argue that the use of the term "defendant" rather than "person" in § 33-6-425 indicates that this provision only applies after an individual "has been transported to a hospital/mental health facility for admission and notification to the general sessions court is required." (Doc. No. 70 at 11-12). If the County Defendants are correct, then Mr. Hargis did not have this protected liberty interest because he had not yet been admitted to treatment and the general sessions court had not yet been notified of his detention.

The involuntary commitment statute uses the term "defendant" to refer to a person subject to involuntary commitment in the context of the general sessions court's probable cause hearing. To illustrate, § 33-6-413 states:

> The chief officer [of a hospital or treatment resource], upon admission of the *person*, shall notify the judge of the general sessions court . . . and shall provide the information from the certificates of need . . . and such other information as the court may desire, that is in the possession of the hospital or treatment resource, bearing on the condition of the *person*.

Tenn. Code Ann § 33-6-413(a) (emphasis added). The next sentence in the provision states:

> If the general sessions court finds that there is probable cause to believe that the *defendant* is subject to admission to a hospital or treatment resource . . . the court may order the *defendant* admitted for not more than five (5) days from the date of the order . . . for emergency diagnosis, evaluation, and treatment pending a probable

33

> cause hearing under § 33-6-422. If the court does not order the defendant admitted, then the *defendant* must be released.

Id. (emphasis added). Other provisions of the statute concerning court proceedings also refer to the involuntarily committed person as a "defendant." See Tenn. Code Ann. §§ 33-6-414 through 33-6-424. Because all other provisions of the statute using the term "defendant" reference court proceedings, the Court, using logic and textual analysis, concludes that the use of "defendant" in § 33-6-425 means that the general sessions court may not order that a person be committed to a jail at the probable cause hearing. Therefore, Ms. Hargis cannot rely on § 33-6-425 as the source of Mr. Hargis's protected liberty interest.

Defendants argue that this conclusion ends the analysis—*i.e.*, because § 33-6-425 only applies following a probable cause hearing, officers are free to detain individuals on mental health holds at jails prior to the hearing. (See Doc. No. 70 at 11-12). The Court disagrees. The Court must determine whether any other provision of the statute creates a liberty interest protecting Mr. Hargis from detention in a jail pending a probable cause hearing and admission to a treatment facility.

The involuntary commitment statute begins as a discretionary scheme: "IF AND ONLY IF" an officer determines a person 1) "has a mental illness or serious emotional disturbance AND 2) the person poses an immediate substantial likelihood of serious harm . . . because of mental illness or serious emotional disturbance," § 33-6-401, then the officer "may" detain the person "to obtain examination for certification of need for care and treatment. Id. See Reeners v. Troup, 2017 WL 9718575, at *8 (M.D. Tenn. Jan. 23, 2020) (holding that §§ 33-6-401 and -402 "*authorize* the detention of an individual for examination. They do not *mandate* that law enforcement detain such individual.") (emphasis in original).

After an officer decides to detain a person, however, his or her discretion ends. Once detained, a person "shall" be "immediate[ly] examine[d] . . . for certification of need for care and treatment" by a "licensed physician, psychologist, or designated professional." Tenn. Code Ann. 33-6-402, 33-6-404. The requirements continue:

1. If the "physician, psychologist, or designated professional" determines a person does not need "emergency diagnosis, evaluation, and treatment," the person "shall [be] release[d]." Tenn. Stat. §§ 33-6-403; 33-6-404.

2. Alternatively, if the "physician, psychologist, or designated professional" determines a person needs "emergency diagnosis, evaluation, and treatment," he or she "shall" complete a certificate of need "showing the factual foundation for the conclusions on each [of the following] item[s]" 1) the person "has a mental illness or serious emotional disturbance, AND 2) the person poses an immediate substantial likelihood of serious harm . . . AND 3) the person needs care, training, or treatment . . . AND 4) all available less drastic alternatives to placement in a hospital or treatment resource are unsuitable to meet the needs of the person." Tenn. Stat. §§ 33-6-403; 33-6-404.

3. After completing the certificate of need, the physician, psychologist or designated professional "shall give the sheriff or the transportation agent . . . the certificate [of need] and turn the person over to the custody of the sheriff or transportation agent . . ." Tenn. Stat. § 33-6-406.

4. The sheriff or transportation agent then "shall transport the person to a hospital or treatment resource." Id.

5. The hospital or treatment resource that receives the person "must" then complete a second certificate of need verifying the person is subject to admission. Tenn. Stat. § 33-6-407(b)-(c).

6. That hospital or treatment resource "shall" then "notify the judge of the general sessions court" of the person's involuntary admission to treatment, and the general sessions court must then determine whether probable cause exists for the person's involuntary admission. Tenn. Stat. § 33-6-413.

The requirements continue beyond the initial probable cause determination, but the Court need not analyze those additional requirements to determine whether Mr. Hargis had a protected liberty interest at the time of his detention. The Court finds he had at least two. First, the statute limits official conduct by requiring Mr. Hargis's "release" if a "licensed physician, psychologist, or designated professional" determines he is "not subject to admission" and does not complete a

35

Certificate of Need. Tenn. Code Ann. § 33-6-404. Second, the statute limits official conduct by requiring the sheriff's department to "transport the person to a hospital or treatment resource that has available suitable accommodations" once a medical professional has given the sheriff's department the completed Certificate of Need and "turn[ed] the person over to the custody of the sheriff." Tenn. Code Ann. § 33-6-406. Neither occurred here.

Furthermore, the statute's trajectory shows that from the time that an officer detains a person for mental health examination to the time the general sessions court determines whether probable cause exists to continue to involuntarily treat that person, a person shall only be evaluated and treated by a "physician, psychologist, or designated professional" at a "hospital or treatment resource." The canon of construction "expressio unius est exclusion alterius" (the expression of one thing implies the exclusion of others) clearly applies to the several provisions of Tennessee's involuntary commitment statute requiring that a person be evaluated and treated at a hospital or treatment resource. See Rich v. Tennessee Bd. of Medical Examiners, 350 S.W.3d 919, 927 (Tenn. 2011); Tenn. Stat. §§ 33-6-403 et seq. Contrary to the County Defendants' assertion that "[t]he statutory scheme in place is vague and confusing, providing no guidance to the County," (Doc. No. 70 at 14), the Court finds these provisions are clear and unambiguous, and the Court construes the statute to "mean what it says." Rich, 350 S.W.3d at 927.

Mr. Hargis's protected liberty interests were potentially violated for two reasons. First, if a jury finds that neither Dr. Oldham nor Jesse Savage "examined" Mr. Hargis and completed a Certificate of Need, then he should have been released from detention because no medical professional determined he was "subject to admission." Tenn. Code Ann. § 33-6-404. The statute is clear that while a police officer may initially detain a mentally ill person for probable cause, that detention can only continue if a medical professional determines the person is subject to admission

36

to a hospital or treatment resource.  See id.  Fact issues abound here that prevent summary judgment.  The Parties dispute whether a Certificate of Need was ever completed.  (See Doc. No. 88 ¶ 37).  Furthermore, the factfinder must determine whether Dr. Oldham's and Mr. Savage's assessments of Mr. Hargis amounted to "examinations," after weighing their credibility as well as any expert testimony offered by the Parties.

Second, once the hospital discharged Mr. Hargis, he was supposed to be "turn[ed] . . . over to the custody of the sheriff or transportation agent who shall transport [him] to a hospital or treatment resource."  Tenn. Code. Ann. 33-6-406.  It is undisputed that that did not happen.  And the Court pauses to note that this may have saved Mr. Hargis' life.  Dr. Oldham discharged Mr. Hargis back into Masters' custody.  Masters drove him to the Overton County Jail, not a hospital or treatment resource.  Then corrections officers booked him into a jail cell rather than transporting him to a hospital or treatment resource.   In doing so, the Defendants ignored the statute's "substantive limitations on official conduct," Fields, 701 F.3d at 185–86, implicating Mr. Hargis's Fourteenth Amendment rights.

The County Defendants argue that another provision of Tennessee law, Tenn. Code Ann. § 41-4-103, permits jails to hold individuals like Mr. Hargis who are awaiting admission to a mental health treatment resource.  (See Doc. No. 70 at 12).  That provision states: "In addition to convicts sentenced to imprisonment in the county jail, the jail is used as a prison for the safekeeping or confinement of the following persons: . . . Insane persons, pending transfer to a hospital for the insane or other disposition."  Tenn. Code Ann. § 41-4-103(a)(6).  That provision was enacted in 1978, 1978 Tenn. Pub. Acts 602 § 1, whereas § 33-6-425 was enacted in 2000, 2000 Tenn. Pub. Laws Ch. 947.  To the extent this provision conflicts with the involuntary commitment statute, the Court finds the later-enacted involuntary commitment statute to be controlling.  See Chartis Cas.

Co. v. State, 475 S.W.3d 240, 246 (Tenn. 2015) ("when there is a conflict between statutes which were enacted at different times, "the more specific and more recently enacted statutory provision" generally controls."). But the two need not conflict. The Court agrees with Ms. Hargis's argument that § 41-4-103(a)(6) applies to "[a] person charged with a felony offense, found not guilty by reason of insanity, and in custody at the time of the verdict [who] may remain held without bond following the verdict, for the purpose of receiving an outpatient evaluation to determine whether the person is committable to a facility . . ." (Doc. No. 85 at 19 (quoting Tenn. Code Ann. § 33-7-303(a)–(c)). Moreover, the Court has not found, and the County Defendants have not offered, any case adopting the County Defendants' interpretation of § 41-4-103.

The City Defendants' remaining argument is not persuasive. They cite Boston v. Lafayette County, Mississippi, 743 F. Supp. 462 (N.D. Miss. 1990) as "legally indistinguishable" from this case. The Court strongly disagrees. In Boston, the mentally ill individual's sister obtained a writ from a Special Master appointed by a chancery court judge ordering that Ms. Boston be taken into custody for a "psychological and physical examination" after she "chok[ed] [her] ten day old baby" and displayed other signs of paranoid schizophrenia. Id. at 465. In other words, prior to her detention, a court found probable cause and ordered the detention—no such thing happened in this case. Further, the opinion quotes Mississippi's involuntary commitment statute, which, unlike Tennessee's statute, states: "the respondent shall not be held in a jail unless the court finds there is no reasonable alternative." Id. at 468 n.10. Tennessee's statute does not contain any "no reasonable alternative" qualifier. See Tenn. Stat. § 33-6-425. Nor did the Boston court engage in any analysis as to whether Mississippi's law granted Ms. Boston a protected liberty interest. See generally id. at 467-70. And finally, as should be obvious, the District Court for the Northern District of Mississippi is subject to precedent of the Fifth Circuit, not the Sixth Circuit, and its

38

opinions are, at most, only persuasive authority to this Court. The Court declines to follow the reasoning of Boston here.

For the reasons above, the Court finds that Mr. Hargis had a protected liberty interest under the Fourteenth Amendment to be detained only in accordance with Tennessee's involuntary commitment law. Because factual issues persist concerning whether his detention complied with the statute, individual Defendants Masters, who transported Mr. Hargis to jail, and Poore, Pettit, and Beaty, who booked him into jail and forcibly put him in a cell, are not entitled to qualified immunity. Ms. Hargis has not alleged facts sufficiently connecting Johnson and Laycock to Mr. Hargis's detention at the Overton County Jail. Neither Johnson nor Laycock transported Mr. Hargis to the jail or put him into the booking cell. Therefore, the Section 1983 Fourteenth Amendment claim is dismissed as to those two Defendants.

### 2.    City of Livingston and Overton County

Ms. Hargis also sues the City of Livingston and Overton County under Section 1983 for her false imprisonment claims. (Doc. No. 1 ¶¶ 143-54, 165-75). A municipality is a "person" subject to liability under Section 1983 if one of four theories applies: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of a federal rights violations." Morgan by next friend Morgan v. Wayne Cnty., 33 F.4th 320, 328 (6th Cir. 2022) (quoting Burgess, 735 F.3d at 478). See also Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 690 (1978).

In 2020, the City of Livingston was reprimanded by General Sessions Court Judge Daryl A. Colson for arresting and detaining individuals with mental illness or serious emotional disturbance. (Doc. No. 99 ¶ 83). In response, a representative of the Livingston Police

39

Department, Lieutenant Logan Carpenter, met with the Overton County Sheriff's Department Chief Deputy, Timothy Poore, to create a new policy whereby the city would no longer *arrest* these individuals, but the county would still *detain* them. (Doc. No. 96 ¶ 54; Doc. No. 99 ¶ 89). Chief Deputy Poore had already spoken to Overton County Sheriff Garrett, and both believed it was lawful for the Overton County Sheriff's Department to jail a mentally ill individual under Ten. Code Ann. § 33-6-401 *et seq.* (Doc. No. 99 ¶ 79; Doc. No. 72-9 ¶ 5). When they met, Poore and Carpenter agreed that "when officers encountered a mental disturbed individual who is not certified 6404 and is combative, then with or without a corresponding arrest, officers would complete the 6401 form for involuntary hold at the jail without a warrant." (Doc. No. 96 ¶ 55; Doc. No. 99 ¶ 90 (internal quotations and citations removed)). Carpenter memorialized this policy in memorandum format and put a copy of it in each Livingston police officer's mailbox at the station. (Doc. No. 85 at 3; Doc. No. 96 ¶ 57). He also displayed the new policy on a bulletin board at the police station. (Id.).

For its part, Overton County created a booking code for individuals being detained at the jail subject to Tennessee's involuntary commitment statute. (Doc. No. 99 ¶ 95). That code was "0671-6401 HOLD." (Id.). Overton County created the code at least several months prior to Poore's and Carpenter's conversation, because the jail started using the code in February 2020. (Id. ¶¶ 95-96). Neither Party has provided record evidence establishing the catalyst for the creation of this code in February 2020. Overton County used this code to book 52 individuals between February 11, 2020 and January 24, 2022. (Id.).

Construing the facts in Ms. Hargis's favor, these facts clearly demonstrate that the City of Livingston and Overton County adopted a policy of involuntarily detaining individuals believed to have mental illness or serious emotional disturbance at the Overton County Jail, with no arrest

40

needed. The City put the policy in writing and prominently displayed it for all police officers. Overton County also acknowledged this policy by creating a special booking code referencing Tennessee's involuntary commitment statute. Monell does not require that a policy have "received formal approval through the [municipal] body's official decisionmaking channels." Monell, 436 U.S. at 690-91. Indeed, a policy need not be written down at all if there is evidence of a custom. See Brown v. Macon County Sheriff's Department, No. 2:21-cv-00009, Doc. No. 170 at 23-24 (M.D. Tenn. Oct. 31, 2023). Overton County's use of its "0671-6401 HOLD" booking code 52 times in less than two years demonstrates such a custom.

The City and County Defendants do not dispute the existence of this policy and custom. Instead, they argue that it does not violate any clearly established constitutional right and as a result, Ms. Hargis's Section 1983 municipal liability claim should fail. (See Doc. No. 65 at 23; Doc. No. 70 at 20). The Court disagrees. As explained in its analysis of the claims against the individual Defendants, the Court finds that Mr. Hargis had a clearly established liberty interest protected by the Fourteenth Amendment to be detained in accordance with Tennessee's involuntary commitment law. Ms. Hargis has established that the City of Livingston and Overton County engaged in a custom of detaining individuals believed to have mental illness or serious emotional disturbance, including Mr. Hargis, in the Overton County Jail. This practice was inconsistent with Tennessee's involuntary commitment law. Neither the City of Livingston nor Overton County are entitled to qualified immunity on Ms. Hargis's Section 1983 false imprisonment claims.

## B. Excessive Force

Ms. Hargis brings two federal excessive force claims:

SIXTH CAUSE OF ACTION: Section 1983 Excessive Force Claim Against Overton County Defendants

SEVENTH CAUSE OF ACTION: Municipal Liability Pursuant to Section 1983 and <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978) for Overton County Defendants' Violations of Civil Rights Against Overton County

The Court will first address the claim against the individual County Defendants and will then address the municipal liability claim against Overton County.

### 1.      Individual County Defendants

The County Defendants ask the Court to grant summary judgment for all the Overton County Jail officers both on the basis of qualified immunity and on the merits.  (Doc. No. 70 at 14-19).  Specifically, the County Defendants maintain that Pettit, Nelson, Webb, Shaver, Tharp, Barnes and Poore are entitled to qualified immunity because their actions restraining Mr. Hargis were "not objectively unreasonable" given the facts and circumstances.  (<u>Id.</u> at 16-18).  As to Crawford, Sidwell, Beaty, and Sakkinen, whom the Complaint alleges "idly watched" the incident (Doc. No. 1 ¶ 185), the County Defendants argue they did not fail to intervene during a constitutional violation, and they had no reason to know the other individual County Defendants' force was excessive (assuming, *arguendo*, that it was).  (Doc. No. 70 at 18).  Ms. Hargis responds that "the right to be free from the substantial risk of asphyxiation in a prone restraint is clearly established," (Doc. No. 85 at 22), preventing the individual County Defendants from receiving qualified immunity.  For the officers whom she alleges "idly watched" the incident, Ms. Hargis argues none are entitled to qualified immunity because they all failed to intervene.  (<u>Id.</u> at 23).

### a.      Legal Standard

The Court first addresses whether the Fourth Amendment or Fourteenth Amendment standard applies to the Section 1983 excessive force claims.  The County Defendants do not specify which standard they think applies and cite cases applying both standards.  (Doc. No. 70 at 14-15 (citing <u>Graham v. Connor</u>, 490 U.S. 386 (1989) (applying Fourth Amendment standard) and <u>Ryan</u>

v. Armstrong, 850 F.3d 419 (8th Cir. 2017) (applying Fourteenth Amendment standard)). Ms. Hargis contends that the Fourteenth Amendment standard applies because Mr. Hargis was already in custody during the use-of-force incident. (Doc. No. 85 at 21). The Court recognizes that following the Supreme Court's decision in Kingsley v. Hendrickson, 576 U.S. 389 (2015), the standard determination is primarily an academic exercise because the Fourth Amendment and Fourteenth Amendment standards are now identical. See Hopper v. Phil Plummer, 887 F.3d 744, 751-52 (6th Cir. 2018). "When assessing excessive-force claims under the Fourth or Fourteenth Amendments . . . we inquire whether the plaintiff has shown that the force purposely or knowingly used against him was objectively unreasonable." Id. (quoting Kingsley, 576 U.S. at 396-97).

The Supreme Court has set the Fourteenth Amendment as the standard for individuals involuntarily detained in mental health treatment institutions. See Youngberg v. Romeo, 457 U.S. 307, 314-16 (1982). The Sixth Circuit has held that the Fourteenth Amendment also applies to an individual voluntarily detained in a mental health institution. See Lanman v. Hinson, 529 F.3d 673, 683 (6th Cir. 2008). Conversely, the Sixth Circuit has held that when an individual is detained at a jail on a warrantless arrest prior to a probable cause hearing, the Fourth Amendment applies to excessive force claims. See Aldini v. Johnson, 609 F.3d 858, 860 (6th Cir. 2010). The Court finds that Mr. Hargis, who was detained in jail on a mental health hold and had not yet received a probable cause hearing, is more analogous to the Aldini plaintiff than the Youngberg and Lanman plaintiffs. While Mr. Hargis was not arrested, he was subject to detention and the general sessions court had not yet been notified of his detention or determined that probable cause existed to detain him. Unlike the plaintiffs in Youngberg and Lanman, Mr. Hargis was not detained in a mental health institution; instead, he was detained in a jail like the Aldini plaintiff. Therefore, the Court

43

concludes that the Fourth Amendment is the correct constitutional standard to apply to Mr. Hargis's use-of-force incident.

The Court must determine "whether the plaintiff has shown that the force purposely or knowingly used against him was objectively unreasonable," Hopper, 887 F.3d at 752, "in light of the facts and circumstances confronting the officers," Lawler v. City of Taylor, 268 Fed. App'x 384, 386 (6th Cir. 2008) (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)). For the officers that Ms. Hargis alleges failed to intervene, she "must show that these defendants observed or had reason to know that excessive force would be or was being used and had both the opportunity and the means to prevent the harm from occurring." Burgess v. Fischer, 735 F.3d 462, 475 (6th Cir. 2013) (quoting Turner v. Scott, 119 F.3d 425, 429 (6th Cir. 1997)) (internal quotations removed).

**b.    Analysis**

Because the County Defendants argue they are entitled to qualified immunity, the Court must determine whether it was clearly established that holding a mentally ill person in a prone restraint after he stops resisting violates his constitutional rights at the time of the incident. The Court finds that it was. In 2004, the Sixth Circuit held that "it is . . . clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." Champion v. Outlook Nashville, Inc., 380 F.3d 893, (6th Cir. 2004). That decision has since been followed by the Sixth Circuit on several occasions, each of which found that holding an individual who is handcuffed or not resisting in a prone position can constitute excessive force. See Lanman, 529 F.3d at 688-89; Martin v. City of Broadview Heights, 712 F.3d 951, 961 (6th Cir. 2013); Hopper, 887 F.3d at 754-56.

44

In Kulpa v. Cantea, 708 Fed. App'x 846 (6th Cir. 2017), the Sixth Circuit addressed an incident with similar facts. Cantea, a corrections officer, held Kulpa, a handcuffed inmate who was exhibiting signs of mental illness, in a prone position when Kulpa resisted being put in a restraint chair. Id. at 848-50. The Sixth Circuit held that "a jury could reasonably determine that Cantea used excessive force" when he put Kulpa in a face-down prone position after Kulpa was no longer resisting him. Id. at 852 (citing Champion, 380 F.3d at 903). In light of the extensive Sixth Circuit precedent concerning the use of prone restraints prior to March 2021, the Court finds that Mr. Hargis's right not to be held in a prone restraint after he was incapacitated was clearly established at the time of the March 30, 2021, incident. When he became incapacitated is yet another fact issue for the jury.

The Court does not find the Eighth Circuit case the County Defendants rely on, Ryan v. Armstrong, 850 F.3d 419 (8th Cir. 2017), to be persuasive. Contrary to the Defendants' assertion, the facts of Ryan are not similar to this case. In Ryan, officers tried to extract a detainee, Harrell, from his cell while he was exhibiting signs of mental distress. The officers' interaction with Harrell lasted less than five minutes, during which Harrell "actively resist[ed] and bit one of the officers." Id. at 424. Unlike Mr. Hargis's autopsy, which concluded Mr. Hargis died by asphyxiation, Harrell's autopsy concluded he died from "sudden unexpected death during restraint" and that he had "suffered no significant injury or trauma." Id. at 428. Additionally, according to that Court's review of Harrell's incident with officers, Harrell resisted throughout the incident and caused injuries to officers, including a minor bite wound. Id. It is not clear that Mr. Hargis caused any injuries to officers while they were trying to place him in the restraint chair. True, Pettit experienced pain while his fingers were caught in Mr. Hargis's handcuffs but that was the result of the manner and circumstances of the officers' attempt to restrain Mr. Hargis. A

45

reasonable factfinder could certainly determine that Mr. Hargis did not cause this injury. Additionally, officers only applied pressure to Harrell while he was in the prone position and actively resisting the officers. Id. The video from Mr. Hargis's incident shows that while the officers applied pressure to Mr. Hargis, he was not resisting the officers. For these reasons, the Court does not find Ryan to be persuasive.

"It is well-settled that qualified immunity must be assessed in the context of each individual's specific conduct." Hopper, 887 F.3d at 756 (quoting Stoudemire v. Mich. Dep't of Corrs., 705 F.3d 560, 570 (6th Cir. 2013)). "[W]here, as here, there is a videotape capturing the events in question, the court must view the facts in the light depicted by the videotape." Campbell, 511 F. Supp. 3d at 817. The Court now evaluates the role of each County Defendant in the use-of-force incident that caused Mr. Hargis's death. Before doing so, the Court determines that one key factual issue—perhaps the most key issue of this incident—impacts all of the individual defendants. That factual issue is at what point Mr. Hargis stopped resisting the officers and was subdued and/or incapacitated. See Champion, 380 F.3d at 903. As the Court's lengthy recitation of the incident earlier in this opinion demonstrates, at numerous times during the incident, Mr. Hargis showed little to no resistance to officers, while at other times he resisted in short bursts of energy. Reasonable factfinders could watch the videotape of the incident and weigh the credibility of fact and expert witnesses' testimony and come to different conclusions concerning when Mr. Hargis stopped resisting the officers. See Kulpa, 708 Fed. App'x at 851-52 (describing several portions of the video in which "a jury could reasonably determine that [the corrections officer] used excessive force"). Therefore, the Court finds that the point at which Mr. Hargis stopped resisting the officers is a question for the jury.

46

### i. Dustin Pettit

It is undisputed that Pettit was involved in the use-of-force incident against Mr. Hargis from its inception. The Court finds that key facts are in dispute that directly concern whether Pettit's use of force was objectively reasonable given the circumstances. Most notably, a factual dispute exists as to whether Pettit tried to shift his weight off of Mr. Hargis's upper body while he was caught in Mr. Hargis's handcuffs. The Parties also dispute whether Pettit and other officers put Mr. Hargis into his final prone position, or whether Mr. Hargis moved himself into that position. These facts must be weighed by a factfinder after viewing the videotape and evaluating Pettit's credibility. Because significant factual issues are in dispute concerning the reasonableness of Pettit's use of force, Pettit is not entitled to qualified immunity or summary judgment on the merits.

### ii. Donald Shaver

Shaver was also actively involved in the restraint of Mr. Hargis for the majority of the incident. While Mr. Hargis lay motionless in his final prone position, Shaver stood inches from Mr. Hargis and watched the other officers restrain him. His active involvement in Mr. Hargis's restraint early in the incident coupled with his close proximity to Mr. Hargis as he took his final breaths precludes the Court from granting him qualified immunity or summary judgment on the merits. A factfinder must determine whether his restraint and failure to intervene were objectively reasonable given the circumstances.

### iii. David Nelson

Nelson was also actively involved in the restraint of Mr. Hargis throughout the entire incident, and alongside Pettit was the officer who most consistently had his hands on Mr. Hargis during the physical restraint. Nelson aided in applying Mr. Hargis's ankle shackles. He also

applied pressure to Mr. Hargis's torso while Pettit was laying across Mr. Hargis's upper body. To be sure, Nelson also aided in untangling Pettit's fingers from Mr. Hargis's handcuffs. Given the factual disputes, particularly over whether Nelson tried to shift Pettit's weight off of Mr. Hargis's body, the factfinder must decide Nelson's culpability in the incident. Nelson is not entitled to qualified immunity or summary judgment on the merits.

### iv.     Samuel Webb

Webb, along with Pettit, Shaver, and Nelson, was one of the four officers who originally brought Mr. Hargis out of the booking cell and tried to put him in the restraint chair. Unlike the other three officers, Webb spent a large portion of the incident standing close by and watching the restraint, but not putting his hands on Mr. Hargis. Webb did, however, actively restrain Mr. Hargis during multiple critical points during the incident, including by retrieving and applying the ankle shackles and by holding Mr. Hargis's hands above his head in his final prone position. Like the other officers, the Court cannot determine Webb's culpability, if any, without assessing his credibility and drawing its own inferences from portions of the videotape that are unclear. That is the job of the factfinder. Webb is not entitled to qualified immunity or summary judgment on the merits.

### v.     Christena Sakkinen

Like Webb, Sakkinen was close by and observed the entire incident. She rarely actively participated in physically restraining Mr. Hargis. However, because she was mere inches from Mr. Hargis for the majority of the incident, the Court finds that Ms. Hargis has met her burden of showing that Sakkinen "observed or had reason to know that excessive force . . . was being used and had both the opportunity and the means to prevent the harm from occurring." Burgess, 735 F.3d at 475 (6th Cir. 2013) (internal quotations omitted). The County Defendants' statements of

fact illustrate why Sakkinen's culpability must be left to the jury—one fact states "Sakkinen did not observe any of the officers using excessive force on Hargis," (Doc. No. 71 ¶ 69), while another states "Sakkinen believed everyone was doing their best to help Hargis and keep him from hurting his eyes further," (id. ¶ 71). These are both statements that are subject to credibility determinations. Sakkinen is not entitled to qualified immunity or summary judgment on the merits.

### vi. Michael Tharp

Tharp joined the scene well into the incident, after Beaty called for backup assistance. However, Tharp took an active role in restraining Mr. Hargis once he was on the scene. He held Mr. Hargis's right calf and ankle the entire time Mr. Hargis was in his final prone position. He also expressed concerns about Mr. Hargis's labored breathing, indicating that he knew Mr. Hargis was having a medical emergency and was no longer able to resist the officers. For these reasons, Tharp is not entitled to qualified immunity or summary judgment on the merits.

### vii. Amanda Poore

Poore also joined the incident after other officers had already struggled for several minutes trying to put Mr. Hargis in the restraint chair. Poore was on scene when Mr. Hargis hit his head on the floor, and she remained on the scene during the entire length of his final prone position. She also actively participated in restraining Mr. Hargis in that position by placing her boot on Mr. Hargis's left ankle and calf. Poore is not entitled to qualified immunity or summary judgment on the merits.

### viii. Melissa Barnes

Barnes joined the incident around the same time that Poore joined the incident. She used paper towels to wipe Mr. Hargis's face and lower body. She stood nearby and watched the other officers restrain Mr. Hargis. She also aided Pettit in releasing his fingers from Mr. Hargis's

handcuffs, and then she aided Webb in holding Mr. Hargis's forearms above his head in the prone position. Barnes was also one of the first officers to try to revive Mr. Hargis, and she may have been the officer to notice he was not moving. Nevertheless, as is the case for the other officers at the scene of the restraint, the Court finds that factual issues, including an assessment of Barnes's credibility, preclude the Court from granting qualified immunity or summary judgment on the merits.

### ix.        Melody Crawford

Crawford arrived to the scene just over six minutes into the incident. Though she is obscured by the booking desk through most of the video, it appears that Crawford was present and observed the majority of the incident from just a few feet away. While she was not actively involved in restraining Mr. Hargis, Crawford was not engaging in any other activities at the prison that would have prevented her from intervening. As it did for Sakkinen, the Court finds that Ms. Hargis has met her burden of showing that Crawford "observed or had reason to know that excessive force . . . was being used and had both the opportunity and the means to prevent the harm from occurring." Burgess, 735 F.3d at 475 (6th Cir. 2013) (internal quotations omitted). For this reason, Crawford is not entitled to qualified immunity or summary judgment on the merits.

### x.        Brittany Sidwell

For the majority of the incident, Sidwell was either not on scene or she was answering phones and manning the jail's booking desk. While she was in close enough proximity to observe the incident, she was engaged in other tasks necessary for the jail to function. Additionally, she was able to observe that no less than eight individuals, including Jail Administrator Poore, were already responding to the incident. Ms. Hargis has not shown that Sidwell "had both the opportunity and the means to prevent the harm from occurring." Burgess, 735 F.3d at 475 (6th

Cir. 2013) (internal quotations omitted). Therefore, the Court grants Sidwell qualified immunity as to Ms. Hargis's Section 1983 excessive force claim.

### xi.  Amber Beaty

It is undisputed that Beaty was not present for the incident but was able to observe it from her position in the tower, where she was working due to a sprained ankle injury. (Doc. No. 86 ¶ 36). Beaty was not allowed to work near inmates because her crutches were a security risk. (Doc. No. 72-3 ¶ 6). Beaty called for additional backup when she noticed Mr. Hargis struggling with officers on the security cameras. (Id. ¶ 7). She was otherwise uninvolved in the incident. Ms. Hargis has not shown that Beaty "had both the opportunity and the means to prevent the harm from occurring." Burgess, 735 F.3d at 475. As such, Ms. Hargis has not met her burden and Beaty will be granted qualified immunity.

### 2.  Overton County

Ms. Hargis brings a municipal liability claim against the Overton County alleging that it failed to train its employees on appropriate use of force against mentally ill detainees and on the dangers of prone restraints. (Doc. No. 1 ¶¶ 187-96). She also alleges that "[t]he inadequacy of [Overton County's] training program regarding mental illness and use of force . . . [is] so obvious as to amount to a policy of deliberate indifference . . ." (Id. ¶ 194). In order to state a claim for municipal liability concerning failure to train, a plaintiff must typically show "prior instances of unconstitutional conduct demonstrating that the County has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." Slusher v. Carson, 540 F.3d 449, 457 (6th Cir. 2008) (quoting St. John v. Hickey, 411 F.3d 762, 776 (6th Cir. 2005)). However, "in [a] narrow range of circumstances, the violation may be a highly predictable consequence of the failure to train and thereby justify a finding of deliberate

51

indifference by policymakers." Board of Cnty. Com'rs of Bryan Cnty., Okl. v. Brown, 520 U.S. 397, 409 (1997) (internal quotations omitted).

Overton County Corrections Officers receive forty hours of BASIC training prior to receiving their state certification from the Tennessee Corrections Institute. (Doc. No. 72-9 ¶ 9). The BASIC training course includes "train[ing] on providing access to medical care to inmates, the use of force, CPR, how to restrain an inmate, and interactions with mentally ill individuals." (Id.). The BASIC training does not include training "on the dangers of prone restraints and positional asphyxia" and instead "provide[s] training primarily aimed at putting inmates into prone positions on the ground." (Doc. No. 99 ¶ 108). Neither Ms. Hargis nor the County Defendants included the BASIC training curriculum in the record before the Court. In addition to the BASIC training course, Overton County Jail must have at least one corrections officer trained in CPR on shift at all times. (Doc. No. 72-9 ¶ 9). All of the corrections officers involved in the incident with Mr. Hargis were trained in CPR. (Id.). While corrections officers are not trained on how to provide medical care or treatment, Overton County Jail contracts with a jail nurse through Southern Health Partners, who is on-site eight hours a day and on-call 24 hours per day, seven days a week. (Id. ¶ 6).

The County Defendants concede that the only training that employees of the Overton County Sheriff's Department receive in mental health is "a couple of hours of a 'Mental Health First Aid' course," which certain employees received in March 2021. (Doc. No. 99 ¶ 104). That training does not "address the care, custody or treatment of individuals suspected of having a mental illness or serious emotional disturbance . . . including: . . . emergency involuntary commitment and proper transportation . . . '6401 medical holds;' or how to safely restrain a patient." (Id. ¶ 106). Officers do attend a one-hour training on mental illness and intellectual

disabilities that includes a section on "Positional and Aspirational Asphyxiation," which includes a directive to "[a]void placing restrained persons in a prone or supine position [because] [b]reathing difficulties may be increased in a prone or supine position." (Doc. No. 85 at 26; Doc. No. 89-13 (Tharp Dep.) at 46, 61 (Ex. 6)). Ms. Hargis alleges that "while [the Overton County Sheriff's Department] trained its patrol deputies on how to safely restrain individuals with mental illnesses or developmental disabilities, [it] provided no such training to its corrections officers." (Id.). The Mental Health First Aid course was given to patrol deputies so that Overton County could access a state grant concerning transport of involuntarily committed individuals to mental health treatment, pursuant to Tenn. Code Ann. § 33-6-406. (Doc. No. 99 ¶ 107).

When Overton County began regularly detaining individuals believed to have mental illness while they awaited admission to treatment, Patrol Lieutenant Tharp and Lieutenant Shaver, both of whom are train corrections officers, expressed concern to Chief Deputy Poore that the jail "was not equipped to care for" mentally ill individuals and "was not staffed by medically qualified personnel who could safely evaluate, monitor, and treat mentally ill detainees." (Doc. No. 85 at 25; see also Doc. No. 99 ¶¶ 97-103).

Based on the facts in the record, a reasonable factfinder could determine that Overton County showed deliberate indifference to the needs of mentally ill detainees when it agreed to jail mentally ill individuals but provided only bare-bones first aid training on mental health, and did not provide that training to the staff who would be interacting with these individuals at the jail. See Jenkins v. Obion, 2022 WL 12029395, at *12-13 (W.D. Tenn. Oct. 20, 2022). Viewing the evidence in the light most favorable to Ms. Hargis, the Court finds that she has presented sufficient evidence to survive summary judgment on her municipal liability failure to train claim.

## II.    STATE LAW CLAIMS

### A.    False Imprisonment

Ms. Hargis's fifth cause of action alleges that the City of Livingston, Officers Masters, Johnson, and Laycock, Overton County, and Overton County Jail employees Pettit, Beaty, and Poore falsely imprisoned Mr. Hargis in violation of Tennessee law.  (Doc. No. 1 ¶¶ 176-81).  "Under Tennessee law, the elements of the tort of false imprisonment are: (1) the plaintiff was restrained or detained against h[is] will by a defendant; and (2) the restraint or detention was unlawful."  Doe v. Andrews, 275 F.Supp.3d 880, 885 (M.D. Tenn. 2017) (citing Newsom v. Thalhimer Bros., Inc., 901 S.W.2d 365, 367 (Tenn. Ct. App. 1995)).  The Defendants do not dispute that Mr. Hargis was detained against his will, but they argue that he was detained with probable cause and in harmony with Tennessee's involuntary commitment law—i.e., his detention was lawful.  (See Doc. No. 65 at 13; Doc. No. 70 at 11).

The Court must first determine whether any of the Defendants are immune from prosecution of this claim under Tennessee's Governmental Tort Liability Act, Tenn. Stat. § 29-20-101 et seq., ("TGTLA").  At common law, all Tennessee governmental entities are immune from prosecution unless Tennessee's legislature specifically waives that immunity.  See Limbaugh v. Coffee Medical Center, 59 S.W.3d 73, 79 (Tenn. 2001).  The TGTLA waives immunity in a number of instances, including for "injury proximately caused by a negligent act or omission of any employee within the scope of his employment."  Tenn. State. § 29-20-205.  However, the legislature made an exception to this section of the TGTLA for certain intentional torts, meaning that it did not waive immunity for those enumerated intentional torts.  Limbaugh, 59 S.W.3d at 81.  The intentional tort exception includes: "False imprisonment pursuant to a mittimus from a court, false arrest, malicious prosecution, intentional trespass, abuse of process, libel, slander, deceit,

54

interference with contract rights, infliction of mental anguish, invasion of right of privacy, or civil rights." Tenn. Stat. § 29-20-205. The Tennessee Supreme Court has held that, while this exception is colloquially referred to as the intentional tort exception, it only applies to the intentional torts specifically enumerated in the exception. See Limbaugh v. Coffee Medical Center, 59 S.W.3d 73, 81 (Tenn. 2001). Because Ms. Hargis does not allege "imprisonment pursuant to a mittimus from a court, . . . the government may not claim immunity under the TGTLA for Plaintiff's false imprisonment claim." Abriq v. Hall, 295 F. Supp. 3d 874, 883 (M.D. Tenn. 2018). Because the City of Livingston and Overton County can be sued for false imprisonment, the individual Defendants cannot. "[T]he TGTLA does not provide governmental entities and employees with simultaneous immunity; when the TGTLA removes immunity for the governmental entity, a governmental employee may be held liable." Whiting v. City of Athens, 2023 WL 6881065, at *8 (E.D. Tenn. Oct. 18, 2023). The Court grants summary judgment to the individual Defendants Masters, Johnson, Laycock, Poore, Beaty, and Pettit.

In order for Ms. Hargis's false imprisonment claim against the City of Livingston and Overton County to stand, she must show that she can establish the elements of negligence against both entities. Abriq, 295 F. Supp. 3d at 883. Ms. Hargis does not allege that the Defendants negligently detained Mr. Hargis, however. Instead, she clearly alleges the Defendant's actions were intentional. (See Doc. No. 1 ¶ 177). As a result, summary judgment will be granted for the City of Livingston and Overton County.

### B.    Assault

Ms. Hargis's eighth cause of action alleges assault pursuant to Tennessee common law against the individual County Defendants as well as the County itself. (Doc. No. 1 ¶¶ 198, 201). Ms. Hargis cannot pursue her assault claim against Overton County because the TGTLA exempts

the county from liability.   Assault is not included in the intentional tort exception of the TGTLA.

See Tenn. Stat. § 29-20-205.  However, a Tennessee Courts of Appeals has recently held that "the

intentional torts of assault and battery that are committed by an employee acting within the scope

of his employment do not remove governmental immunity."   Spearman v. Shelby Cty. Bd. of

Educ., 637 S.W.3d 719, 733 (Tenn. Ct. App. 2021).  Additionally, the County Defendants argue

that Overton County is immune because the alleged assault of Mr. Hargis occurred during a civil

rights violation and the assault claim is a companion claim to Ms. Hargis's Section 1983 excessive

force claim.  (Doc. No. 70 at 22-23).  That argument is supported by at least two recent decisions

of the Tennessee Court of Appeals.  See, e.g., Siler v. Scott, 591 S.W.3d 84, 97 (Tenn. Ct. App.

2019); Cochran v. Town of Jonesborough, 586 S.W.3d 909, 919 (Tenn. Ct. App. 2019).  In line

with those decisions, the Court finds that Overton County is immune from Ms. Hargis's common

law assault claim.

While Overton County cannot be sued for common law assault, the individual County

Defendants can.  Whiting, 2023 WL 6881065, at *8.  The analysis does not end there; the Court

must decide which, if any, of the individual County Defendants are entitled to summary judgment

as to this claim. "In Tennessee, the tort of assault has two elements: (1) An intentional attempt or

the unmistakable appearance of an intentional attempt to do harm to, or to frighten, another person;

and (2) The present ability or the unmistakable appearance of the present ability to do that harm

or to cause that fright."  Doe v. Andrews, 275 F. Supp. 3d 880, 887 (M.D. Tenn. 2017) (quoting

T.P.I. Civil § 8.01) (internal quotations omitted).

As an initial matter, the Court notes that while Ms. Hargis brings this claim against all of

the "Overton County Defendants," (Doc. No. 1 at 29), she does not make any allegations against

Officer Beaty, (Id. ¶¶ 197-201).  For this reason, summary judgment is granted as to Officer Beaty.

Additionally, the Court finds that Ms. Hargis has not produced admissible evidence that Officers Sidwell and Crawford, who observed portions of the incident but did not touch Mr. Hargis, intentionally attempted to do harm to or to frighten Mr. Hargis, nor did their actions create the unmistakable appearance of such an attempt. See Doe, 275 F. Supp. 3d at 887. The Court thus dismisses the assault claim against Officers Sidwell and Crawford. For the remaining individual County Defendants, the Court uses its analysis of the individual County Defendants' actions from the Section 1983 excessive force section of this opinion. Each of the other individual Defendants actively participated in the restraint of Mr. Hargis, and factual issues exist, including credibility determinations, concerning each of those individuals' intent or unmistakable appearance of intent to do harm to Mr. Hargis. The assault claim will not be dismissed against Pettit, Shaver, Nelson, Webb, Sakkinen, Poore, Tharp, or Barnes.

### C. Battery

Ms. Hargis's ninth cause of action alleges battery under Tennessee common law against Overton County and individual County Defendants Webb, Sakkinen, Pettit, Nelson, Shaver, Tharp, Barnes and Crawford. The claim against Overton County cannot stand for the same reason the assault claim fails against the county. See Tenn. Stat. 29-20-205; Siler, 591 S.W.3d at 97; Cochran, 586 S.W.3d at 919. "A battery is any intentional, unlawful, and harmful (or offensive) physical contact by one person with another person." T.P.I. Civil § 8.02. The Court grants summary judgment on this claim as to Crawford because the video shows that while she was in the vicinity of the incident, she did not participate. Furthermore, Ms. Hargis does not allege any facts suggesting Crawford ever touched Mr. Hargis. (See Doc. No. 86 ¶ 62). The Court denies summary judgment on this claim as to the other individual County Defendants for the reasons articulated in its Section 1983 excessive force analysis.

**CONCLUSION**

For the foregoing reasons, the Court will **GRANT IN PART** and **DENY IN PART** the

City Defendants and County Defendants' Motions for Summary Judgment.

An appropriate Order will be entered.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

58