UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| HALEY HARGIS, as personal representative of the ESTATE OF JONATHAN MARK HARGIS, | Case No. 2:22-cv-00011 |
| Plaintiff, | Chief Judge Waverly D. Crenshaw, Jr. Magistrate Judge Alistair E. Newbern |
| v. | |
| OVERTON COUNTY, TENNESSEE et al., | |
| Defendants. | |

## MEMORANDUM ORDER

This action arises out of the death of Jonathan Mark Hargis in the custody of the Overton County Sheriff's Department (OCSD) at the Overton County Jail in Livingston, Tennessee. (Doc. No. 1.) Plaintiff Haley Hargis (Ms. Hargis) filed this action on behalf of her father's estate and asserts claims of false imprisonment and excessive force under 42 U.S.C. § 1983 and false imprisonment, assault, and battery under Tennessee law against Defendants the City of Livingston, Tennessee; Livingston Police Department (LPD) Officers Thomas Johnson, Jeremy Laycock, and J.D. Masters (collectively, the City Defendants); and Overton County, Tennessee; OCSD Jail Administrator Amanda Poore; OCSD Lieutenant Donald Shaver; OSCD Patrol Lieutenant Michael Tharp; and OCSD Corrections Officers Melissa Barnes, Amber Beaty, Melody Crawford, David Nelson, Dustin Pettit, Christena Sakkinen, Brittany Sidwell, and Samuel Webb (collectively, the County Defendants). (*Id.*)

This Memorandum Order addresses Ms. Hargis's motion for spoliation sanctions against the County Defendants under Federal Rule of Civil Procedure 37(e). (Doc. No. 62.) Ms. Hargis argues that Overton County culpably failed to preserve video footage from one of the cameras that

recorded the events leading to Hargis's death. (Doc. Nos. 62, 63.) She asks the Court to find that the failure to preserve this evidence was intentional and to impose a mandatory adverse inference jury instruction against the County Defendants on that basis. (Doc. No. 63.) She also asks the Court to award attorney fees and costs. (*Id.*) The County Defendants have responded in opposition to Ms. Hargis's motion, arguing that sanctions are not warranted. (Doc. No. 83.) Ms. Hargis did not file an optional reply in support of her motion.

Considering the parties' arguments and the record evidence, and for the reasons that follow, Ms. Hargis's motion for sanctions will be granted in part and denied in part.

## I.  Relevant Background

The Court described the facts of Hargis's detention and death at length in its memorandum opinion addressing the defendants' summary judgment motions. (Doc. No. 105.) The Magistrate Judge will summarize the facts relevant to Ms. Hargis's motion for spoliation sanctions here.

Early on the morning of March 29, 2021, the City of Livingston received two 911 calls regarding Hargis's erratic behavior at a local gas station. (*Id.*) The LPD dispatched Masters to investigate and Johnson to provide backup. (*Id.*) Masters drove to the scene, spoke to Hargis, and offered to call a family member or emergency services. (*Id.*) Hargis told Masters that he wanted to see a doctor but did not want Masters to call emergency medical services. (*Id.*) Masters then drove Hargis to the Livingston Regional Hospital emergency department with Johnson following in a separate car. (*Id.*)

The hospital admitted Hargis at 7:15 a.m. (*Id.*) Nurses checked his vital signs and examined him, and emergency department physician Dr. Karen Oldham observed Hargis's interactions with the nurses. (*Id.*) At some point, Johnson radioed Laycock, who was at the LPD station, and asked him to bring a form for authorizing involuntary mental health detention under Tenn. Code Ann.

§ 33-6-401 (6-401 form) to the hospital. (*Id.*) Laycock brought the form to Masters and stayed to provide additional backup. (*Id.*)

Oldham signed the 6-401 form at 7:24 a.m., attesting that she had "reason to believe that [Hargis] ha[d] a mental illness or serious emotional disturbance" and "pose[d] an immediate substantial likelihood of serious harm . . . ." (Doc. No. 62-1, PageID# 383.) Oldham authorized Hargis's involuntary commitment "under Tenn. Code Ann. § 33-6-402 for immediate examination under Tenn. Code Ann. § 33-6-404 to determine whether [he was] subject to admission to a hospital or treatment resource under" Tennessee's involuntary commitment statute. (*Id.*) In support of her decision to authorize Hargis's commitment, Oldham noted that Hargis's behavior included "confusion, hallucinations[,] and delusions[.]" (*Id.*) Oldham testified that she, the nurses, Masters, Johnson, and Laycock determined that Hargis was too aggressive to be detained at the hospital. (Doc. No. 62-5.) The hospital discharged Hargis to police custody at around 7:50 a.m., and Masters transported Hargis to the Overton County Jail. (Doc. Nos. 62-5, 105.)

Masters and Hargis arrived at the jail at 7:55 a.m. Masters told Beaty and Pettit that Hargis "was being brought in as a mental health hold, that the doctor had signed off on it, and that Officer Johnson would be bringing the paperwork from the hospital." (Doc. No. 105, PageID# 1853 (citation omitted).) Pettit patted Hargis down, and Beaty, Pettit, and Masters placed Hargis in an observation cell in the jail's booking area. (Doc. No. 105.)

The events captured by preserved surveillance video footage took place on March 30, 2021. The Court described those events in its summary judgment opinion as follows:

> At 12:54 PM on March 30, Corrections Officers Christena Sakkinen and Samuel Webb "noticed that Hargis was bleeding, as he was attempting to claw his eyes." (Doc. No. 86 ¶ 15). At 12:56 PM, Corrections Officers David Nelson, Webb, and Pettit, and Lieutenant Donald Shaver attempted to remove Mr. Hargis from his cell and place him in a restraint chair. (Id. ¶¶ 16–17; Doc. No. 72-1, Ex. 2 (Incident Video) at 12:56:24). Mr. Hargis, who was naked, lunged out of his cell. (Id., Ex. 2

at 12:56:54–12:56:56). Shaver, Pettit, Nelson and Webb grabbed Mr. Hargis and took him to the ground, where he lay on his stomach with his hands, which were handcuffed in the front, over his head. (Id., Ex. 2 at 12:56:57–12:57:14). This is called a "prone" position.

Mr. Hargis lay in the prone position, not moving or resisting, for approximately one minute and twenty seconds. (Doc. No. 72-1, Ex. 2 at 12:57:15–12:58:34). During this time, Shaver, Pettit, and Nelson had their hands on Mr. Hargis. (Id.). Webb retrieved ankle shackles. (Id., Ex. 2 at 12:57:35–12:58:07). Then Webb, Pettit, and Nelson secured Mr. Hargis's ankles. (Id., Ex. 2 at 12:58:08–12:58:25). Pettit and Shaver next lifted Mr. Hargis into a kneeling position. (Id., Ex. 2 at 12:58:29–12:58:38). Webb and Nelson, who did not have hands on Mr. Hargis at this time, remained close and watched Shaver and Pettit lift Mr. Hargis to his knees. (Id.). Due to the angle of the video camera, once Mr. Hargis was on his knees, his body was mostly obscured by Nelson's back. (Id., Ex. 2 at 12:58:39–12:58:43).

While Mr. Hargis was in the kneeling position, Sakkinen moved the restraint chair closer to Mr. Hargis. (Id., Ex. 2 at 12:58:42–12:58:46). At this point, Mr. Hargis lunged forward, (id., Ex. 2 at 12:58:44–12:58:46), and he was then again put into a prone position by Shaver, Pettit, and Nelson, after which Nelson and Pettit placed their hands on his arms and Shaver and Webb stood close by and observed Mr. Hargis (id., Ex. 2 at 12:58:46–12:58:49). Mr. Hargis remained in this position for approximately three minutes, during which he appeared to be still and did not appear to resist the officers. (Id., Ex. 2 at 12:58:49–01:01:39).

Nelson, Pettit, Shaver and Webb then tried again to lift Mr. Hargis. (Id., Ex. 2 at 01:01:39–01:01:52). Mr. Hargis began struggling with the four officers and resisting being put in the restraint chair. (Id., Ex. 2 at 01:01:53–01:02:01). The jail nurse, Darlene Grimsley, moved the restraint chair closer to Mr. Hargis, and Sakkinen came to stand behind the restraint chair. (Id., Ex. 2 at 01:02:04–01:02:14). Mr. Hargis then came to a seated position in front of the chair, with Nelson, Pettit, Webb and Shaver holding onto him. (Id., Ex. 2 at 01:02:14). The officers tried unsuccessfully again to put Mr. Hargis in the chair, and he resisted and ended up leaning on the chair, with his upper body, head and arms resting on the chair and his legs kneeling on the floor. (Id., Ex. 2 at 01:02:34–01:03:24). Around this time, Corrections Officer Melody Crawford entered the booking area, where she appeared to observe the incident from a few feet away. (Id., Ex. 2 at 1:03:08–01:03:19).

Mr. Hargis remained kneeling against the restraint chair for approximately two minutes, not appearing to move or resist the officers. (Id., Ex. 2 at 01:03:24–01:05:29). During this time, Shaver, Nelson and Webb all had their hands on Mr. Hargis's upper body and arms. (Id.). Pettit briefly walked away and off camera but returned to the scene approximately one minute later. (Id., Ex. 2 at 01:03:39–01:04:32). When he returned to Mr. Hargis, Pettit also placed his hands on Mr. Hargis's upper body. (Id., Ex. 2 at 01:04:33). Shaver then left and returned

4

approximately two minutes and forty-five seconds later. (Id., Ex. 2 at 01:05:22–01:07:09).

Mr. Hargis began to struggle with the officers again, though his movements are mostly obscured in the video by Webb's body so the Court cannot determine the extent of his resistance. (Id., Ex. 2 at 01:05:30). At this point, Pettit, Nelson, Webb, and Sakkinen all worked to restrain Mr. Hargis back into the kneeling position against the restraint chair. (Id., Ex. 2 at 01:05:31–01:05:42). The video does not clearly show where the officers' hands were placed on Mr. Hargis's body at this time or whether they were applying pressure. (Id.). Jail Administrator Amanda Poore and Corrections Officer Melissa Barnes then entered the booking area to assist the other officers. (Id., Ex. 2 at 01:05:25–01:05:43). After approximately another minute where he appeared to lie still across the chair, (id., Ex. 2 at 01:05:43–01:06:58), Mr. Hargis began to try to stand up, (id., Ex. 2 at 01:06:59–01:07:03). Pettit, Nelson and Webb tried to restrain him back down onto the chair. (Id.). During this struggle, Mr. Hargis fell onto his back and hit his head forcefully on the floor. (Id., Ex. 2 at 01:07:04–01:07:06). The Court cannot clearly discern from the video whether Mr. Hargis fell backward on his own or was taken to the ground by the officers. (Id.).

After Mr. Hargis hit his head and laid with his back on the ground, Nelson and Shaver put their hands on his chest, and Pettit briefly put one of his hands on Mr. Hargis's neck. (Id., Ex. 2 at 01:07:06–01:07:13). At this point, Webb stood up and removed his hands from Mr. Hargis, but continued to stand over Mr. Hargis and observe the scene. (Id., Ex. 2 at 01:07:10). Mr. Hargis moved his hands to cover his face and Pettit put his right hand on Mr. Hargis's head. (Id., Ex. 2 at 01:07:18–01:07:49). Patrol Lieutenant Michael Tharp then entered the scene, apparently after Beaty noticed the incident on security cameras from her post in the tower, and radioed for additional assistance. (Id., Ex. 2 at 01:07:24–01:07:39; Doc. No. 86 ¶¶ 36-37). Mr. Hargis appeared to lay still on his right side with his hands covering his face for approximately one minute. (Doc. No. 72-1, Ex. 2 at 01:07:19–01:08:24). During this time, Crawford and Barnes appeared to wipe Mr. Hargis's lower body and the restraint chair with toilet paper or paper towels. (Id.). Shaver, Sakkinen, Webb, and Nurse Grimsley observed while Nelson, Pettit, and Tharp had their hands on Mr. Hargis. (Id.).

Mr. Hargis moved from lying on his side to the prone position. It is not clear whether the officers placed him in the prone position or Mr. Hargis put himself in that position. Once he was in the prone position, Nelson and Pettit held Mr. Hargis's arms over his head and put their hands on his neck and Tharp held Mr. Hargis's lower body. (Id., Ex. 2 at 01:08:31–01:09:28). Mr. Hargis appeared to try to sit up, and Nelson, Pettit and Tharp use force to restrain him. (Id., Ex. 2 at 01:09:36–01:11:19). Webb, who was observing, obscured Mr. Hargis's body from the camera for nearly two minutes at this point, and the Court cannot discern Mr. Hargis position or movements during that time. (Id.). Mr. Hargis was laying on his left side with his arms and hands out in front of him when Webb moved out of the camera's

line of sight. (Id., Ex. 2 at 01:11:20–01:11:25). Pettit's hands were on Mr. Hargis's wrists. (Id., Ex. 2 at 01:11:25–01:11:42).

The Parties dispute the next critical moments. The County Defendants claim that "Hargis was laying on his left side, then suddenly moved onto his stomach and pulled his hands out in front of him . . . caus[ing] Pettit to be pulled over on top of Hargis's torso." (Doc. No. 71 ¶¶ 46–47). Ms. Hargis contends that "[a]vailable surveillance footage shows Officer Pettit sliding his right knee outward and moving Mr. Hargis's hands to Officer Pettit's right-hand side in a sweeping motion." (Doc. No. 86 ¶ 46). She further contends that "The other officers can be seen assisting Officer Pettit in moving Mr. Hargis into this prone position." (Id. ¶ 47). She disputes that Mr. Hargis pulled Pettit on top of him, stating that "it was impossible for Mr. Hargis to have pulled Officer Pettit onto his back. The only feasible way Mr. Hargis could have pulled Officer Pettit on top of him is if Mr. Hargis had been lying on his right side instead." (Id.). The Court has watched the video of the incident many times, (Doc. No. 72-1, Ex. 2 at 01:11:31–01:11:51), and finds that a reasonable factfinder could agree or disagree with either party's interpretation. Because the Court is obligated to view the facts in the light most favorable to the non-moving party, the Court accepts Ms. Hargis's version, that Pettit and the other officers moved Mr. Hargis into the prone position. See Tolan, 572 U.S. at 651.

When the officers moved Mr. Hargis into the prone position, Pettit fell on top of Mr. Hargis's upper body because his fingers were stuck in Mr. Hargis's handcuffs. (Doc. No. 72-1, Ex. 2 at 01:11:44–01:11:49). Pettit stayed on top of Mr. Hargis's upper body for approximately two minutes. (Id., Ex. 2 at 01:11:49–01:13:44). During most of this time, Tharp and Shaver held Mr. Hargis's calves and ankles, Webb held his forearms, Nelson held his lower torso down, and Pettit continued to lay across his upper torso. (Id.). After Pettit had been laying across Mr. Hargis's upper body for more than a minute, Sakkinen, Barnes and Nelson began to assist in untangling his fingers from Mr. Hargis's handcuffs. (Doc. No. 72-1, Ex. 2 at 01:12:54–01:13:44). At some point during this time, Tharp noted that Mr. Hargis's breathing sounded labored. (Doc. No. 86 ¶ 62; Doc. No. 89-13 at 40 (Tharp Dep. 84:18–23)).

Here, the parties dispute another material fact, and the Court finds that a jury could interpret the video according to either party's position. The County Defendants say that while Pettit was lying across Mr. Hargis's body, "Nelson and Pettit tried to raise [Pettit's] body off Hargis while the other officers attempted to get his fingers unstuck." (Doc. No. 71 ¶ 50). Ms. Hargis disagrees, stating that the video shows no such attempts. (Doc. No. 86 ¶ 50).

After Pettit became unstuck, Webb, Barnes, Nelson, Tharp, and Poore continued to physically restrain Mr. Hargis while he lay on the floor. (Id., Ex. 2 at 01:13:47–01:15:16). Shaver and Sakkinen watched. (Id.). After approximately another ninety seconds of holding Mr. Hargis in the prone position, the officers noticed he was not moving and turned him over onto his back. (Id., Ex. 2 at 01:15:16–01:15:21). At this point Shaver and Barnes tried to wake him by tapping

his feet and face and doing a sternum rub. (Id., Ex. 2 at 01:15:21–01:17:14). When that did not work, Nurse Grimsley began life-saving efforts. (Id., Ex. 2 at 01:17:08–01:20:59). He was then taken by emergency medical services to Livingston Regional Hospital. (Id., Ex. 2 at 01:20:59–01:22:22).

Mr. Hargis later died after being transferred to Tristar Hospital. (Doc. No. 62-5 at 20 (Oldham Dep. 72:5–13)). His autopsy states that the cause of death was asphyxiation, and the manner of his death was homicide. (Doc. No. 99 ¶ 116).

(Doc. No. 105, PageID# 1855–60.)

After EMS transported Hargis to the hospital, Jail Administrator Poore called Overton County Sheriff John Garrett and told him what had happened. (Doc. No. 62-1.) Garrett notified the Tennessee Bureau of Investigation (TBI) in accordance with jail policies regarding possible in-custody deaths. (Doc. Nos. 62-1, 62-4.) The TBI opened an investigation and sent special agents to the jail that day to review security footage, collect evidence, and conduct interviews. (Doc. Nos. 62-2, 62-4.)

OCSD Chief Deputy Tim Poore testified that he reviewed security footage with the TBI agents who investigated the incident on March 30, 2021. (Doc. Nos. 62-4, 84-1.) There are three security cameras in the jail's booking area, two of which—the Booking Camera and the Booking Phone Camera—are relevant to the motion for sanctions.[1] (Doc. No. 62-3, 62-4, 84-1.) Chief Deputy Poore testified that the jail's security system automatically records over video around twenty-five to thirty days after the video is created. (Doc. Nos. 62-4, 84-1.) The only way to permanently save security system video is to download the footage for storage. (Id.) According to Poore, the jail does not have a policy regarding when to download and save video footage. (Id.)

---

[1] Chief Deputy Poore testified that the third camera "would [not] have caught much" and that he and the TBI agents investigating the incident with Hargis did not "even look[ ] at that . . . angle." (Doc. No. 62-4, PageID# 480.) Ms. Hargis has not challenged the County Defendants' failure to preserve footage from the third camera.

7

Chief Deputy Poore retrieved footage from the Booking Camera and the Booking Phone Camera on his computer for the TBI agents. (*Id.*) Chief Deputy Poore testified that, when he pulled up the footage, it automatically began downloading to his computer. (*Id.*) Chief Deputy Poore and the TBI agents began watching the Booking Camera video at the 12:53 p.m. mark, around when Sakkinen noticed Hargis bleeding and called for backup. (*Id.*) When the footage reached the 1:07 p.m. mark, the TBI agents asked Chief Deputy Poore "if there was a better angle" from a different camera because an open cell door was blocking part of what could be seen from the Booking Camera. (Doc. No. 84-1, PageID# 1198, ¶ 3.) Chief Deputy Poore stopped playing the Booking Camera footage and began playing the Booking Phone Camera footage at the 12:56 p.m. mark. (Doc. Nos. 62-4, 84-1.) Chief Deputy Poore states that, when he stopped playing the Booking Camera video, the video stopped downloading to his computer. (Doc. No. 62-4.) Chief Deputy Poore and the TBI agents continued watching the entire event on the Booking Phone Camera (*id.*) and, Chief Deputy Poore states, "the TBI agents were satisfied with the angle . . ." (Doc. No. 84-1, PageID# 1198, ¶ 3). All the Booking Phone Camera footage that the TBI agents watched downloaded to Chief Deputy Poore's computer.

Chief Deputy Poore testified that the TBI agents later returned and asked him to pull up footage from the time Hargis arrived at the jail until the events they had previously viewed started. (Doc. Nos. 62-4, 84-1.) Chief Deputy Poore saved and copied the requested footage from the Booking Phone Camera. (*Id.*) Chief Deputy Poore did not download any additional footage from the Booking Camera. Chief Deputy Poore testified that, other than the approximately fourteen minutes of footage he viewed with the TBI agents, the Booking Camera footage of the events preceding Hargis's death no longer exists. (*Id.*)

On April 1, 2021, Ms. Hargis learned that her father had been hospitalized and declared brain dead. (Doc. No. 62-8.) On April 2, 2021, she traveled from her home in Ohio to Tristar Hospital. (*Id.*) Hospital staff told Ms. Hargis that her father had been taken to the Overton County Jail before his hospitalization and that the TBI was investigating his death, but no one told her how Hargis died. (*Id.*) Ms. Hargis called the jail, spoke to Jail Administrator Poore, and set a meeting with Jail Administrator Poore and Sheriff Garrett for April 5, 2021. (*Id.*) Ms. Hargis authorized the removal of her father from life support and the release of his body and returned to Ohio. (*Id.*)

On April 5, 2021, Ms. Hargis traveled from Ohio to Livingston, Tennessee, to meet with Jail Administrator Poore and Sheriff Garrett. (Doc. Nos. 62-8, 84-2.) Ms. Hargis states that:

> Both Sheriff Garrett and Jail Administrator Poore told me that corrections officers at the Overton County Jail were trying to help my father; that, before their jail nurse could even administer a shot to help calm him, my father had become unresponsive; that the corrections officers tried to help him through CPR and calling EMS to take him to the hospital; that my father had died of a heart attack; and that, because there was a pending investigation by the TBI, I should follow up with that agency for more information.

(Doc. No. 62-8, PageID# 696, ¶ 10.) Jail Administrator Poore states that, "[a]fter [ ] learn[ing] about Mr. Hargis's passing, [she] recall[s] there being discussions that he had passed away from a heart attack" and that, "[o]n April 5, 2021, that is the only cause of death of which [she and Sheriff Garret] were aware." (Doc. No. 84-2, PageID# 1204, ¶ 8.)

Later that month, Ms. Hargis contacted the TBI, "who told [her] that the autopsy had not yet been completed" because "the medical examiner was still reviewing video footage from the Overton County Sheriff's Office" and that, once the autopsy "was completed, [she] would receive a copy of the report in the mail within eight to twelve weeks." (Doc. No. 62-8, PageID# 696, ¶¶ 12, 13.) Ms. Hargis states that she never received a copy of the autopsy report from the TBI or the medical examiner. (Doc. No. 62-8.) It was not until November 22, 2021, after she hired an attorney to investigate the circumstances of her father's death, that Ms. Hargis "learn[ed] for the first time

that the autopsy report showed that the medical examiner determined the cause of [her] father's death was asphyxia and the manner of his death [was] a homicide." (*Id.* at PageID# 697, ¶ 18.)

Ms. Hargis argues that severe spoliation sanctions are warranted under Federal Rule of Civil Procedure 37(e)(2) because Overton County had a duty to preserve all video footage related to the events preceding her father's death and intentionally breached that duty by selectively preserving some of the footage and allowing the rest to be destroyed. (Doc. No. 63.) The County Defendants argue that sanctions are not warranted because they were unaware of any duty to preserve the footage before it was destroyed and never intended to prevent Ms. Hargis from using the deleted footage in litigation. (Doc. No. 83.)

## II. Legal Standard

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Billiter v. SP Plus Corp.*, 329 F. Supp. 3d 459, 465–66 (M.D. Tenn. 2018). Federal courts may address spoliation by using the "wide array of tools to manage the discovery process, some provided by the Federal Rules of Civil Procedure, some stemming from their inherent power 'to achieve the orderly and expeditious disposition of cases.'" *EPAC Techs., Inc. v. HarperCollins Christian Publ'g, Inc.*, Case No. 3:12-cv-00463, 2018 WL 1542040, *10 (M.D. Tenn. Mar. 29, 2018) (*EPAC I*) (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630–31 (1962)), *aff'd as modified sub nom EPAC Techs., Inc. v. Thomas Nelson, Inc.*, 2018 WL 3322305 (M.D. Tenn. May 14, 2018)(EPAC II). "The policy underlying this inherent power of the courts is the need to preserve the integrity of the judicial process in order to retain confidence that the process works to uncover the truth." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001).

10

Rule 37(e) addresses spoliation of electronically stored information (ESI). It provides that:

[i]f electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

>> (A) presume that the lost information was unfavorable to the party;

>> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or

>> (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e)(1)–(2).

"Federal courts have readily found that Rule 37[(e)] broadly contemplates [spoliation of] video surveillance." *Black v. Costco Wholesale Corp.*, 542 F. Supp. 3d 750, 752 (M.D. Tenn. 2021) (citing *Wooden v. Barringer*, Case No. 3:16-cv-446, 2017 WL 5140518, at *4 (N.D. Fla. Nov. 6, 2017) (collecting cases)).

III.     **Analysis**

The general rules governing spoliation sanctions "are not controversial. But applying them to determine when a duty to preserve arises in a particular case and the extent of that duty requires careful analysis of the specific facts and circumstances." *Rimkus Consulting Grp. v. Cammarata*, 688 F. Supp. 2d 598, 613 (S.D. Tex. 2010). The Court will address each factor of the Rule 37(e) analysis in light of the unique facts and circumstances of this case.[2]

_____

[2]     The parties do not dispute that the deleted footage constitutes ESI and that Rule 37(e), as amended in 2015, therefore controls the spoliation analysis in this case. However, Ms. Hargis and the County Defendants also employ the three-factor spoliation analysis that applied in the Sixth Circuit to ESI before December 1, 2015, and continues to apply to non-ESI discovery. (Doc.

The Sixth Circuit has instructed district courts "to consider incidences raising spoliation questions on a case-by-case basis, considering the purposes of a spoliation sanction and the factors for determining whether one should be imposed." *Adkins v. Wolever*, 692 F.3d 499, 506 (6th Cir. 2012). When a party alleges spoliation by multiple actors, this may require conducting a unique Rule 37(e) analysis for each actor to determine the individual level of culpability and the appropriate resulting sanction. *See id.* Here, Ms. Hargis argues that Overton County had a duty to preserve evidence relevant to the events preceding her father's death and that the "County—by and through the actions of OCSD and its agents—intentionally allowed material video footage to be recorded over and lost forever." (Doc. No. 63, PageID# 726.) Ms. Hargis has not argued that the individual County Defendants had the same duty to preserve evidence as the County or the same responsibility for allowing the subject footage to be deleted. (Doc. No. 63.) Ms. Hargis also did not respond to the individual County Defendants' argument that most of them had no control over the security system video footage and, thus, no duty to ensure its preservation. (Doc. No. 83.) Because Ms. Hargis has not argued that the Rule 37(e) factors are met with respect to each individual County Defendant and has not responded to the individual County Defendants' arguments that they are not, the Court will consider only whether Rule 37(e) sanctions are warranted against Overton County. The Court will deny her motion with respect to individual County Defendants Barnes, Beaty, Crawford, Nelson, Pettit, Jail Administrator Poore, Sakkinen, Shaver, Sidwell, Tharp, and Webb.

---

Nos. 63, 83.) Because Rule 37(e) replaced the three-factor test for an alleged failure to preserve ESI, the Court will apply only the Rule 37(e) factors here. *See, e.g.*, *EPAC I*, 2018 WL 1542040, at *11 ("A different standard for imposing sanctions, set by Rule 37(e), applies when the lost information is in electronic form."); *Best Payphones, Inc. v. N.Y.C.*, Nos. 1-CV-3924, 1-CV-8506, 3-CV-0192, 2016 WL 792396, at *3 (E.D.N.Y. Feb. 26, 2016) ("As of December 1, 2015, the new Fed. R. Civ. P. 37(e) governs a party's failure to preserve electronically stored information.").

### A. Overton County's Obligation to Preserve Relevant Evidence

The starting point for the spoliation analysis in this case is "whether and when a duty to preserve arose." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. Rule 37(e) incorporates the common-law "duty to preserve relevant information when litigation is reasonably foreseeable." *Id.* This duty "arises no later than when a lawsuit is filed but may be triggered earlier than the filing of the complaint depending on the particular circumstances." *Bistrian v. Levi*, 448 F. Supp. 3d 454, 468 (E.D. Pa. 2020); *see also John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir. 2008) ("[A] party to civil litigation has a duty to preserve relevant information, including ESI, when that party 'has notice that the evidence is relevant to litigation or . . . should have known that the evidence may be relevant to future litigation.'"(second alteration in original) (quoting *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001))); *Silvestri*, 271 F.3d at 591 ("The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." (citing *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998))).

"A variety of events may alert a party to the prospect of litigation[,]" Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment, and there is therefore "no single bright line that definitively marks when litigation reasonably should be anticipated." *Bistrian*, 448 F. Supp. 3d at 468. Instead, whether "litigation is 'reasonably foreseeable' is a flexible fact-specific standard that allows a district court to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry." *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011); *see also Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 77–78 (3d Cir. 2012) (quoting *id.*). "We apply an objective, not subjective standard." *Byrd v. Alpha All. Ins. Corp.*, 518 F. App'x 380, 384 (6th Cir. 2013). The question is "whether a reasonable party in the same factual circumstances would have reasonably foreseen litigation[,]" not whether the parties in a particular

case actually anticipated litigation. *Micron Tech., Inc.*, 645 F.3d at 1320. Reasonable foreseeability requires something more than "the mere existence of a potential claim or the distant possibility of litigation[,]" but it does not "require that litigation be 'imminent, or probable without significant contingencies[.]'" *Id.* (citation omitted).

"In the spoliation case law, certain kinds of incidents are viewed as being especially likely to lead to litigation. Incidents in which inmates are injured in prison are one such category[.]" *Bistrian*, 448 F. Supp. 3d at 469. "A number of courts have found that government defendants reasonably should have anticipated litigation from the time an inmate was seriously injured or died in custody." *Id.* (collecting cases); *see also Mixon v. Pohlman*, Civ. Action No. 20-1216, 2022 WL 2867091, at *7 (E.D. La. July 21, 2022) ("The death of an inmate is a serious incident, and the court has no trouble finding that this alone should have put the defendants on notice of impending litigation and created a duty to preserve evidence."); *Johnson v. Bonner Cnty.*, Case No. 2:18-cv-00244, 2021 WL 5828025, at *6 (D. Idaho Dec. 8, 2021) ("When a state actor exercises its unique power of deadly force to enforce the law, it should reasonably be aware that those barriers, safeguards, and checks—which include litigation—will come into play to ensure that such power was correctly used."); *Jenkins v. Woody*, Civ. Action No. 3:15cv355, 2017 WL 362475, at *15 (E.D. Va. Jan. 21, 2017) (finding that defendant sheriff should reasonably have anticipated litigation after pretrial detainee's death in custody). "That is not to say that the mere fact of . . . [an injury sustained in prison] is always enough to put defendants on notice of potential litigation and trigger a duty to preserve." *Bistrian*, 448 F. Supp. 3d at 469. But an in-custody injury or death "combined with other circumstances may often be enough that defendants should reasonably anticipate litigation beginning soon after the incident itself." *Id.*; *see also Jenkins*, 2017 WL 362475, at *15 (finding that pretrial detainee's death together with other circumstances triggered

defendant sheriff's duty to preserve relevant evidence). Other circumstances that courts consider in determining whether and when a duty to preserve evidence arises following an in-custody injury or death include:

> the type and seriousness of the injury; how often similar kinds of incidents lead to litigation; the "course of conduct between the parties, including past litigation or threatened litigation"; and what steps both parties took after the incident and before the loss of the evidence, including whether the defendant initiated an investigation into the incident.

*Bistrian*, 448 F. Supp. 3d at 468 (first quoting *Wiedeman v. Canal Ins. Co.*, No. 1:15-cv-4182, 2017 WL 2501753, at *3 (N.D. Ga. June 9, 2017); and then citing *Zbylski v. Douglas Cnty. Sch. Dist.*, 154 F. Supp. 3d 1146, 1163 (D. Colo. 2015)).

Ms. Hargis argues that "Overton County was on sufficient notice of reasonably foreseeable litigation as soon as Mr. Hargis had become unresponsive on the floor of the jail" (Doc. No. 63, PageID# 728) or, at the latest, when the TBI began its investigation or when Ms. Hargis came to the jail to meet with OCSD officials regarding her father's death (*id.* at PageID# 726). Ms. Hargis notes that these events took place—and the duty to preserve evidence arose—well before the jail security system recorded over the subject video. The County Defendants disagree. They argue that no duty to preserve arose in those twenty-five to thirty days because Ms. Hargis's behavior during that time "gave the impression she would not be filing a lawsuit related to her father's death." (Doc. No. 83, PageID# 1182.) Specifically, the County Defendants point to Ms. Hargis's behavior at the April 5, 2021 meeting with Jail Administrator Poore and Sheriff Garrett and emphasize that Ms. Hargis did not "ask[ ] if there was any video footage to review[,]" did not "mention[ ] speaking with an attorney[,]" "indicated she had not had a relationship with Mr. Hargis in some time[,] and expressed gratitude by thanking and hugging [Jail Administrator] Poore at the conclusion of the meeting." (*Id.*) According to the County Defendants, the earliest date on which a duty to preserve evidence arose was on September 2, 2021, when Ms. Hargis's counsel sent an evidence

preservation letter to the Overton County Attorney. (Doc. No. 83.) By that time, the jail's system had recorded over the unsaved Booking Camera footage. (*Id.*)

The circumstances in this case support a finding that Overton County's duty to preserve evidence arose on March 30, 2021, when an unresponsive Hargis was taken to the hospital and the TBI began its investigation of the surrounding events. At that time, Overton County—through Jail Administrator Poore, Chief Deputy Poore, and Sheriff Garrett[3]—knew that Hargis had been in the jail's custody because of an involuntary mental health commitment and that he had stopped breathing after being forcibly restrained by more than half-a-dozen OCSD employees during an approximately twenty-minute struggle. This was, indisputably, a very serious event. *See Mixon*, 2022 WL 2867091, at *7 (finding that "[t]he death of an inmate is a serious incident"). In these circumstances, "more serious injuries" and, by extension, fatal injuries "naturally are more likely to lead to litigation." *Bistrian*, 448 F. Supp. 3d at 470.

OCSD policies appear to recognize this likelihood and require, first, that employees who use force or witness the use of force against a detained person file written incident reports and, second, that the OCSD notify the TBI of any in-custody death so that it can begin an investigation. (Doc. No. 62-1.) Policies like these "exist[ ], at least in part, because of a reasonable anticipation of litigation." *Jenkins*, 2017 WL 362475, at *15. Here, there is no dispute that the individual County Defendants all prepared use-of-force reports regarding Hargis; that Jail Administrator Poore called Sheriff Garrett after Hargis was transported to the hospital and Garrett immediately notified the TBI; or that the TBI began an investigation on the same day for the

---

[3]     While Ms. Hargis did not name Chief Deputy Poore and Sheriff Garrett as defendants, the County Defendants produced Chief Deputy Poore as a Rule 30(b)(6) witness and have not disputed that his knowledge and Sheriff Garrett's knowledge are relevant to the Court's determination of when Overton County's duty to preserve evidence arose.

purpose of "uncovering any criminal activity" or "wrongful conduct . . . ." (Doc. No. 83, PageID# 1184.) At the very latest, Overton County's duty to preserve evidence arose when Ms. Hargis contacted Jail Administrator Poore on April 1, 2021, to meet with her and Sheriff Garrett about the circumstances of her father's involuntary commitment and death. *Cf. Johnson*, 2021 WL 5828025, at *6 (finding that "[a]ny reasonable person, and especially a reasonable law enforcement officer, should have assumed that a decedent's [family] would ask questions and demand answers following an officer shooting, and that such questioning could come in the form of litigation").

The County Defendants' arguments to the contrary are not persuasive. First, the argument that Overton County could not have anticipated litigation until it received a preservation letter from Ms. Hargis's attorney on September 2, 2021, finds no support in relevant authority. While "demand letters, preservation requests, threats of litigation, or a party's decision to pursue a claim" independently trigger the obligation to preserve relevant evidence, *Black*, 542 F. Supp. 3d at 753, "a future litigant is not required to make such a request [or threat], 'and a failure to do so does not vitiate the independent obligation of an adverse party to preserve such information' if the adverse party knows or should know of impending litigation." *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 522 (D. Md. 2010) (quoting *Thompson v. U.S. Dep't of Hous. and Urb. Dev.*, 219 F.R.D. 93, 100 (D. Md. 2003)), *aff'd in part and modified in part on other grounds*, Civ. Action No. 06-2662, 2010 WL 11747756 (D. Md. Nov. 1, 2010); *see also Buren v. Crawford Cnty.*, Case No. 13-cv-14565, 2017 WL 168156, at *11 (E.D. Mich. Jan. 17, 2017) (finding that, "[e]ven if Defendants had not received either [plaintiff's] notice [to preserve evidence or her Freedom of Information Act request], they would still have had an obligation to preserve audio/visual recordings of the [fatal police] shooting" at issue).

Second, it was not reasonable for Overton County to assume that Ms. Hargis would not file a lawsuit because she did not state or otherwise demonstrate her intent to do so in the April 5, 2021 meeting with Jail Administrator Poore and Garrett. "[T]he common-law standard . . . is—like all reasonableness tests—an objective one[,]" and does not look to Ms. Hargis's subjective intent to define Overton County's duty to preserve. *Bistrian*, 448 F. Supp. 3d at 471. This argument also ignores that Ms. Hargis had an incomplete understanding of the events surrounding her father's death when she met with Jail Administrator Poore and Garrett. The County Defendants do not dispute that Jail Administrator Poore and Garrett told her that her father died of a heart attack or that Ms. Hargis did not know the full extent of the use of force that preceded her father losing consciousness. Only Overton County and its agents knew those facts at that time. A reasonable party in Overton County's position would have anticipated that, when Ms. Hargis learned the full circumstances surrounding her father's death litigation would be reasonably foreseeable. *See Micron Tech., Inc.*, 645 F.3d at 1320 (holding that reasonable foreseeability does not "require that litigation be 'imminent, or probable without significant contingencies'" (citation omitted)); *Bistrian*, 448 F. Supp. 3d at 468 (same). Overton County's duty to preserve evidence relevant to Hargis's death thus arose as early as the time of Hargis's transfer to the hospital and no later than Ms. Hargis's meeting with Jail Administrator Poore and Garret.

The next question in the Court's Rule 37(e) analysis is whether Overton County's preservation duty extended to the Booking Camera footage at issue in Ms. Hargis's motion. Fed. R. Civ. P. 37(e). "A party that reasonably should anticipate litigation 'must not destroy unique, relevant evidence that might be useful to an adversary.'" *Bistrian*, 448 F. Supp. 3d at 473 (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003)); *see also EPAC I*, 2018 WL 1542040, at *17 ("While a litigant is under no duty to keep or retain every document in its

possession . . . it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request." (alteration in original) (quoting *Kemper Mortg., Inc. v. Russell*, No. 3:06-cv-042, 2006 WL 2319858, at *2 (S.D. Ohio Apr. 18, 2006))). Relevant in this context means "'something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence.'"[4] *Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*, 774 F.3d 1065, 1071 (6th Cir. 2014) (quoting *Automated Sols. Corp. v. Paragon Data Sys., Inc.*, 756 F.3d 504, 514 (6th Cir. 2014)). Where, as here, the evidence in question is surveillance footage of an in-custody death, "[t]he circumstances of the death in custody will dictate how much video may be relevant." *Mixon*, 2022 WL 2867091, at *7.

Ms. Hargis argues that the deleted "surveillance footage is unquestionably relevant to [her] claims for excessive force, assault, and battery against the County Defendants[,]" particularly her allegations that Pettit and Nelson "'plac[ed] most, if not all, of their body weight onto [Hargis's] upper body'" while he lay prone on the booking area floor. (Doc. No. 63, PageID# 731 (quoting Doc. No. 1, PageID# 18, ¶ 124).) The County Defendants have not disputed Ms. Hargis's assertion that the deleted Booking Camera footage was relevant for purposes of the Rule 37(e) analysis. Instead, they argue that, once Chief Deputy Poore provided the TBI with the surveillance footage it requested for its own investigation—all of the Booking Phone Camera footage from the time Hargis was admitted to the jail to the time he was transferred to the hospital, but not the Booking

---

[4]     Federal Rule of Evidence 401 provides that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401(a)–(b).

Camera footage it rejected because of the initially obstructed angle—"there was no further duty to preserve all of the video footage." (Doc. No. 83, PageID# 1184.)

But what the TBI identified as relevant to its criminal investigation does not define what Overton County should have recognized as relevant to possible future civil litigation. The fact that the TBI launched an investigation into the events preceding Hargis's hospitalization and death triggered and amplified Overton County's duty to preserve relevant evidence, it did not replace it. *See Bistrian*, 448 F. Supp. 3d at 470 ("[A] defendant's decision to open an investigation can indicate that it was reasonable to expect a lawsuit."); *Yela Fiduciary Servs. ex rel. Est. of Sund v. Benton Cnty.*, Case No. 6:20-cv-01925, 2022 WL 17666400, at *6 (D. Or. Dec. 14, 2022) (finding that Department of Justice's investigation into in-custody deaths weighed in favor of finding that county defendants had a duty to preserve relevant evidence).

Further, it appears that the deleted Booking Camera footage would have been relevant in both contexts. Ms. Hargis has provided the Court with the preserved initial minutes of the Booking Camera footage and all of the Booking Phone Camera footage, which the Court has reviewed. This footage confirms that the Booking Camera angle was obscured and captured very little of the first few minutes of the struggle between Hargis and jail employees. However, the Booking Phone Camera footage shows that, as the struggle continued, Hargis and the individual defendants moved toward the Booking Camera and, it appears, into its view. This is confirmed by the testimony of Defendant Amber Beaty, who watched the Booking Camera footage in real time from her post in the jail's control tower. (Doc. No. 62-3.) Beaty testified that the Booking Camera clearly showed the position of Nelson's and Webb's bodies in relation to Hargis in the minutes before Hargis stopped breathing. (*Id.*) That information is directly relevant to the questions of what force was

used by whom to restrain Hargis and whether that use of force was excessive.[5] As Chief Deputy Poore admitted, he "probably should have" preserved all of the Booking Camera footage because "[t]hat way there would have been no question" about what happened. (Doc. No. 62-4, PageID# 480, 482.)

The Court finds that, considering the circumstances surrounding Hargis's death, Overton County had a "duty to ensure that any potential recording of the incident was preserved" *Buren*, 2017 WL, 168156, at \*11, including the deleted Booking Camera footage.

### B.     Whether Overton County Took Reasonable Steps to Preserve the Deleted Footage

Rule 37(e) only authorizes remedial measures if a "party failed to take reasonable steps to preserve" ESI that it had a duty to preserve. Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. The advisory committee notes to the 2015 amendment explain "that 'reasonable steps' to preserve suffice" and the rule "does not call for perfection." *Id.* To determine whether a party took reasonable steps to preserve lost evidence in a particular case, courts should consider the party's sophistication with respect to litigation, level of control over the lost evidence, resources, and any evidence of the routine, good-faith operation of an information retention system. *Id.*

The question for the Court is whether Overton County took objectively reasonable steps to preserve the Booking Camera footage for purposes of Rule 37(e). It is undisputed that Chief Deputy Poore's partial download of the footage on the day of the incident is the only step taken by any actor to preserve this footage from automatic deletion. Ms. Hargis argues that this

---

[5]     The importance of having another point of view of these events is underscored by the Court's memorandum opinion addressing the County Defendants' motion for summary judgment, in which the Court repeatedly noted the "significant limitations" of the available video evidence. (Doc. No. 105, PageID# 1855.)

preservation of some but not all video footage was not reasonable for purposes of Rule 37(e) because Overton County is a sophisticated litigant and, through Jail Administrator Poore, Chief Deputy Poore, and Sheriff Garrett, it knew or "should have known that civil litigation was likely and that the jail surveillance footage would be a crucial part of it."[6] (Doc. No. 63, PageID# 729.) The County Defendants argue that "Chief Deputy Poore had every reason to believe that his cooperation with the directive of the TBI preserved any necessary evidence" and that his "actions were reasonable in specifically saving the footage from one of the camera angles and believing that that was sufficient to provide the TBI with everything the agents needed to determine any wrongful conduct and/or criminality." (Doc. No. 83, PageID# 1184.) But, as already established, the scope and purpose of the TBI's investigation was not coextensive with the civil litigation that Overton County should have reasonably anticipated. And, again, Chief Deputy Poore's subjective beliefs do not determine whether Overton County's actions to preserve relevant evidence were objectively reasonable under the circumstances. *See, e.g.*, *Bistrian*, 448 F. Supp. 3d at 471 (recognizing that "all reasonableness tests" are "objective one[s]").

Federal courts routinely find that counties—particularly county jails and their administrators and employees—are sophisticated litigants for purposes of Rule 37(e) because they are or should be "familiar with preservation obligations" given their "considerable experience in litigation." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment; *see also, e.g.*, *Est. of Bosco v. Cnty. of Sonoma*, 640 F. Supp. 3d 915, 926 (N.D. Cal. 2022) (finding that county jail was "a sophisticated party" under Rule 37(e)); *Vogt v. MEnD Corr. Care, PLLC*, Case No. 21-cv-1055, 2023 WL 2414551, at *8 (D. Minn. Jan. 30, 2023) (finding that "[c]ounty was not an

---

[6]    The County Defendants have not disputed that Chief Deputy Poore's knowledge and Sheriff Garrett's knowledge are relevant to the Court's assessment of the reasonableness of Overton County's preservation efforts.

unsophisticated party" under Rule 37(e)); *Yela Fiduciary Servs. ex rel. Est. of Sund*, 2022 WL 17666400, at *5 (finding that defendant jail deputies were "sophisticated professionals" under Rule 37(e)); *Blazer v. Gall*, No. 1:16-CV-01046, 2019 WL 3494785, at *4 (D.S.D. Aug. 1, 2019) (finding county and county sheriff were not "unsophisticated parties" for purposes of Rule 37(e)). The County Defendants have not disputed that Overton County is a sophisticated litigant for purposes of Rule 37(e) that was or should have been familiar with its preservation obligations.

Further, preserving the relevant footage would have required very little effort. The Booking Camera footage was within Overton County's control until twenty-five to thirty days after Hargis's death. There is no evidence that the footage was "destroyed by events outside [Overton County's] control" such as a "computer room . . . flood[], a 'cloud' service [] fail[ure], [or] a malign software attack . . . ." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. Overton County had the resources to preserve the deleted footage, as evidenced by its preservation of a portion of the Booking Camera footage and the entirety of the Booking Phone Camera footage.

Finally, while the routine operation of the jail's electronic system recorded over surveillance footage after twenty-five to thirty days, the circumstances here "call[ed] for reasonable steps to preserve information by intervening in that routine operation." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. "Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." *Zubulake*, 220 F.R.D. at 218. "Because 'there are many ways to manage electronic data, litigants are free to choose how this task is accomplished,' so long as a 'complete set of relevant documents' is retained." *EPAC I*, 2018 WL 1542040, at *17 (quoting *Zubulake*, 220 F.R.D. at 218).

Here, although Chief Deputy Poore downloaded the footage that the TBI wanted for its investigation, none of Overton County's agents or employees took the additional step of considering whether the rest of the footage might be relevant to future litigation. In these circumstances—where the TBI's investigation had already shown the importance of video footage of the event—it was not reasonable for Overton County to fail to ensure that all video footage was preserved.

The Court finds that Overton County failed to take reasonable steps to preserve the deleted Booking Camera footage for purposes of Rule 37(e).

### C. Whether Loss of the Deleted Footage Prejudiced Other Parties

There is no dispute that the deleted Booking Camera footage "cannot be restored or replaced through additional discovery[.]" Fed. R. Civ. P. 37(e). Rule 37(e) thus directs the Court next to consider whether there is "prejudice to another party from loss of the information[.]" Fed. R. Civ. P. 37(e)(1). "The rule leaves judges with discretion to determine how best to assess prejudice in particular cases." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. It "does not place a burden of proving or disproving prejudice on one party or the other" and, instead, recognizes that "[d]etermining the content of lost information may be a difficult task in some cases, and placing the burden of proving prejudice on the party that did not lose the information may be unfair." *Id.*

Ms. Hargis argues that she is prejudiced by the loss of the deleted Booking Camera footage because, as Beaty testified, the Booking Camera's angle would show whether Pettit and Nelson placed pressure or body weight on top of Hargis during the struggle. (Doc. No. 63.) Ms. Hargis alleges that they did and asserts that the deleted footage "either would have corroborated [this] testimony or, more likely under the circumstances, would have undermined it." (*Id.* at PageID# 732–33.) The County Defendants respond that Ms. Hargis "is not prejudiced by the

absence of the 'Booking' camera footage" because she can show the jury the Booking Phone Camera footage from which the medical examiner "concluded that the manner of Mr. Hargis's death was homicide" and which, the County Defendants argue, "was clearly sufficient for the TBI to conduct and conclude its investigation." (Doc. No. 83, PageID# 1186, 1187.) The County Defendants further argue that "there is nothing in the record to support" Ms. Hargis's position that the deleted footage would have undermined Beaty's testimony and that this assertion "is sheer speculation." (*Id.* at PageID# 1187.) They argue that "[t]he only actual evidence given is that the footage would support the officers' version of events, thus prejudicing the County by the lack of its existence." (*Id.*)

The County Defendants' argument ignores that Ms. Hargis must speculate as to what the deleted Booking Camera video would show because she has not and cannot view it. The available Booking Phone Camera footage "has significant limitations" because, among other reasons, "Hargis is blocked by corrections officers for a substantial portion of the video" and "[l]arge portions of the video are not clear and create jury issues." (Doc. No. 105, PageID# 1855.) Further, as the Court found at summary judgment, there is evidence in the record that would support Hargis's version of events and could have been corroborated by the deleted footage. The medical evidence shows that the cause of Hargis's death was asphyxiation and the manner of his death was homicide, meaning "that the death was caused by another individual or individuals." (Doc. No. 62-6, PageID# 618.) Ms. Hargis is prejudiced by the loss of video that would show the actions of at least two individuals in the struggle more clearly. The Court therefore concludes, based on the record evidence, that Ms. Hargis has been prejudiced by the loss of the deleted Booking Camera footage for purposes of Rule 37(e).

### D. Appropriate Sanctions

Having found that the deleted Booking Camera footage should have been preserved in the anticipation of litigation, that it was lost because Overton County failed to take reasonable steps to preserve it, that it cannot be restored or replaced through additional discovery, and that its loss prejudices Ms. Hargis, Rule 37(e)(1) directs the Court to "order measures no greater than necessary to cure th[at] prejudice[.]" Fed. R. Civ. P. 37(e)(1). Ms. Hargis asks the Court to impose "a mandatory adverse inference instruction against the County Defendants pursuant to Fed. R. Civ. P. 37(e)(2)(B)" (Doc. No. 63, PageID# 738.) Rule 37(e)(2), however, requires a finding of specific intent to impose that harsh remedy. The Court may only "instruct the jury that it may or must presume the [lost] information was unfavorable to [Overton County]" "upon finding that the [County] acted with the intent to deprive another party of the information's use in [ ] litigation . . . ." Fed. R. Civ. P. 37(e)(2)(B); *see also EPAC Techs., Inc. v. HarperCollins Christian Publ'g, Inc.*, No. 3:12-cv-00463, 2019 WL 109371, at *15 (M.D. Tenn. Jan. 4, 2019) (*EPAC III*) ("The more severe sanctions available under Rule 37(e)(2), including an adverse inference jury instruction, may be imposed only on a finding of specific intent 'to deprive another party of the information's use in the litigation.'" (quoting Fed. R. Civ. P. 37(e)(2))). "In instances such as these, '[a] showing of negligence or even gross negligence will not do the trick.'" *Black*, 542 F. Supp. 3d at 754 (quoting *Applebaum v. Target Corp.*, 831 F.3d 740, 745 (6th Cir. 2016)); *see also* Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment (explaining that Rule 37(e) "is designed to provide a uniform standard in federal court for use of these serious measures when addressing failure to preserve electronically stored information" and "rejects cases . . . that authorize the giving of adverse-inference instructions on a finding of negligence or gross negligence").

26

Whether an actor destroyed records with a culpable state of mind turns "on the alleged spoliator's mental state regarding any obligation to preserve evidence and the subsequent destruction." *Beaven v. U.S. Dep't of Just.*, 622 F.3d 540, 553 (6th Cir. 2010). Ms. Hargis argues that the Court should infer that Overton County intended to deprive her of the use of the deleted Booking Camera footage in litigation because it selectively preserved other camera footage while "misleading both medical staff and [Ms. Hargis's] family regarding the circumstances surrounding Mr. Hargis's death." (Doc. No. 63, PageID# 735.) Ms. Hargis further argues that the County Defendants' explanation for the failure to preserve the deleted footage—namely, that Overton County thought it had preserved all necessary footage by complying with the TBI's preservation request—is not credible and that "[t]he more plausible explanation for the spoliation at issue is that, by allowing the video footage to be deleted, Overton County intended to obfuscate the truth." (Doc. No. 63, PageID# 738.) The County Defendants disagree, arguing that, in light of Chief Deputy Poore's compliance with the TBI's preservation request, the "failure to save [the additional deleted] footage was negligent at best." (Doc. No. 83, PageID# 1188.)

Ms. Hargis primarily relies on Overton County's selective preservation of other surveillance footage to argue that the Court should infer the necessary intent to deprive her of the full Booking Camera footage in litigation. (Doc. No. 63.) Ms. Hargis is correct that a party's selective preservation of evidence is one factor that may establish the specific intent required to obtain adverse inference instructions under Rule 37(e). *See, e.g.*, *Bistrian*, 448 F. Supp. 3d at 475–76 ("Selective preservation can also reflect intent."); *Culhane v. Wal-Mart Supercenter*, 364 F. Supp. 3d 768, 773–74 (E.D. Mich. 2019) (finding that party's decision to "preserve *some but not all* pertinent video evidence" without any explanation for that decision weighed in favor of finding requisite intent); *Est. of Hill ex rel. Grube v. NaphCare, Inc.*, No. 2:20-cv-00410, 2022 WL

1464830, at *12 (W.D. Wash. June 8, 2023) ("Courts have [ ] found the 'intent to deprive' when a litigant selectively preserves ESI which it knows to be relevant without a credible explanation, allowing some portions to be overwritten by automatic procedures." (citing *Culhane*, 364 F. Supp. 3d at 774)). However, the Court is not persuaded that the selective preservation of some video footage by Overton County establishes the required specific intent here.

"Common sense suggests that when a party preserves helpful or neutral information while deleting harmful information, that tends to indicate intentionality." *Bistrian*, 448 F. Supp. 3d at 476. That is not what happened in this case. The footage that Overton County preserved from the Booking Phone Camera and produced to Ms. Hargis and the TBI is, by all accounts, adverse to its litigation position. While the TBI found no criminal wrongdoing based on the preserved footage, the medical examiner found from the same footage that Hargis died of asphyxiation and that his death was a homicide. This is not a case in which a party kept only the helpful evidence. *See Bistrian*, 448 F. Supp. 3d at 476–77 ("[T]he mere fact that some information was preserved and some was not does not necessarily amount to suspicious selective preservation.") Nor is it a case in which the party with the preservation obligation offered no explanation for its selective preservation of relevant evidence. *Cf. Vogt*, 2023 WL 2414551, at *9 ("No explanation—credible or otherwise—has been offered for why the footage from Camera 18 was available for Fosteson to review with the Department of Corrections inspector but not preserved with the other footage."); *Est. of Bosco*, 640 F. Supp. 3d at 928 ("Defendants offer no explanation in their briefing for why Mitchell would not have noticed and asked for the missing video during his investigation."); *Est. of Hill*, 2022 WL 1464830, at *12 ("Spokane County offers the Court no explanation—credible or otherwise—about why someone at Spokane County Detention Services made the intentional choice to preserve video from 8:43 a.m. to 9:15 a.m. and 4:00 p.m. to 6:30 p.m. yet chose to allow

the portion from 9:15 a.m. to 4:00 p.m. to be permanently destroyed."). Chief Deputy Poore testified that the reason he did not preserve the full Booking Camera footage of the incident, even though he admits that he probably should have, was because the TBI did not ask for it after viewing and downloading the Booking Phone Camera footage. Jail Administrator Poore testified that she "believed the TBI had requested all the footage that was needed for the investigation." (Doc. No. 84-2, PageID# 1203, ¶ 3.)

It is confounding that such sophisticated parties—well-familiar with excessive force litigation—would not recognize the relevance of and need to preserve all video footage recording the events preceding an in-custody death. However, the Court cannot find on this record that Overton County's actions rise to the level of the specific intent required by Rule 37(e). The deletion of the subject Booking Camera footage was grossly negligent, but not done for the purpose of excluding that video from use in this litigation. *See, e.g.*, *Black*, 542 F. Supp. 3d at 754–55; *Bistrian*, 448 F. Supp. 3d at 477; *Jenkins*, 2017 WL 362475, at *17. The severe sanction of an adverse inference instruction is therefore not appropriate. *See* Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment; *EPAC I*, 2018 WL 1542040, at *12; *Black*, 542 F. Supp. 3d at 755.

However, because Hargis has demonstrated prejudice resulting from the loss of the subject footage, "[t]he Court must craft a remedy 'no greater than necessary to cure the prejudice.'" *EPAC II*, 2018 WL 3322305, at *3 (quoting Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment). The advisory committee notes to Rule 37(e)'s 2015 amendment explain that "[t]he 'range' of measures a district court is authorized to impose under Rule 37(e)(1) is 'quite broad.'" *Bistrian*, 448 F. Supp.3d at 478 (quoting Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment). Available sanctions include:

striking certain evidence, permitting "evidence and argument to the jury regarding the loss of information," and instructing the jury as to how to evaluate the loss of information, among other things. It also includes requiring the spoliating party to pay the reasonable attorney's fees incurred by the other side in litigating the loss of the ESI. Courts must take care, however, that sanctions imposed under Rule 37(e)(1) not have the effect of sanctions permitted only on a finding of intent to deprive.

*Id.* (footnotes omitted) (quoting Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment). The advisory committee notes further explain that, under Rule 37(e)(1), courts may "allow[ ] the parties to present evidence to the jury concerning the loss and likely relevance of information and instruct[ ] the jury that it may consider that evidence, along with all the other evidence in the case, in making its decision." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.

Considering the relevance of the deleted footage, the resulting prejudice to Ms. Hargis, and the degree of Overton County's culpability, the Court finds that a lesser evidentiary sanction is warranted. The Court finds that the parties should be allowed to present evidence regarding the deletion of the Booking Camera footage and that the following jury instruction regarding the deleted Booking Camera footage should be given:[7]

Overton County had a duty to preserve all the Booking Camera footage that showed the events leading to Hargis's death and negligently failed to do so. Such footage, which is now permanently deleted, would have shown those events from a different angle than the available video footage and may have provided a better view of the way in which individual actors restrained Mr. Hargis, including whether those actors used force and, if so, what amount of force they used. You may give the fact of the lost video footage any weight you deem appropriate as you consider all of the evidence presented at trial.

---

[7]     Jury instructions will be ultimately finalized by the Chief District Judge.

The Court finds this lesser sanction to be no greater than necessary to address the prejudice of the loss of the Booking Camera footage through Overton County's negligence. *Cf. EPAC II*, 2018 WL 3322305, at *3.

IV.     **Conclusion**

For these reasons, Ms. Hargis's motion for spoliation sanctions (Doc. No. 62) is GRANTED IN PART AND DENIED IN PART as explained in this Memorandum Order.

Ms. Hargis's request for attorney fees and costs is DENIED WITHOUT PREJUDICE to being raised with any other motion for fees and costs at the conclusion of the litigation.

It is so ORDERED.

_____
ALISTAIR E. NEWBERN
United States Magistrate Judge